HAMPDEN RAILROAD CORPORATION *vs.* BOSTON AND MAINE
RAILROAD.

Hampden.   March 21, 1919. — June 24, 1919.

Present: RUGG, C. J., LORING, DE COURCY, CROSBY, & CARROLL, JJ.

*Railroad,* Contract to lease.  *Contract,* Validity.

In an action by one railroad corporation against another for the alleged breach
   of a so called "Agreement for Lease" under the power given by St. 1906, c. 463,
   Part II, § 209, as amended by St. 1907, c. 585, § 8, by the refusal of the de-
   fendant to take a lease of the railroad of the plaintiff, by the agreement sued
   upon the defendant covenanted "to execute the lease, a draft of which is hereto
   attached . . . as the same may be modified by the Railroad Commission of
   Massachusetts."  The plaintiff covenanted to lease its railroad to the defendant
   "subject to the approval of the Board of Railroad Commissioners, of Massa-
   chusetts, upon terms and conditions as set forth in a draft of lease hereto
   attached . . ., such lease to be modified in such particulars as the Board of
   Railroad Commissioners may require."  A petition for approval of the lease was
   filed by the plaintiff but no action was taken on it by the commissioners.  *Held,*
   that the parties to the alleged "agreement for lease" had no power under the
   statute or otherwise to make an agreement to execute a lease upon terms to
   be determined afterwards and that the action could not be maintained.

CONTRACT by the Hampden Railroad Corporation against the
Boston and Maine Railroad for alleged breach of an alleged con-
tract in writing dated September 5, 1911, to lease the railroad of
the plaintiff to the defendant.  Writ dated July 1, 1914.

In the Superior Court the case was tried before *Aiken,* C. J.
The material facts are stated in the opinion.  The "Agreement
for Lease" described in the opinion was admitted in evidence
subject to the defendant's exception.  At the close of the evi-
dence the judge ordered a verdict for the defendant; and the
plaintiff alleged exceptions.

*H. Parker & R. G. Dodge,* (*H. S. Davis* with them,) for the
plaintiff.

*G. L. Mayberry,* (*L. A. Mayberry & J. M. Hallowell* with him,)
for the defendant.

RUGG, C. J.   This is an action to recover damages for breach

of a written contract executed under date of September 5, 1911, whereby the defendant agreed to take a lease of the railroad of the plaintiff. The certificate of establishment of the plaintiff as a railroad corporation was dated June 2, 1911. When the contract was made the plaintiff had a charter and locations and was authorized to build its railroad, but no construction work had been done. The idea of the Hampden railroad originated with one Mellen, at that time the president of both the New York, New Haven, and Hartford Railroad Company and the Boston and Maine Railroad, and was fostered by him in furtherance of his conceptions as to the mutual advantage of these two corporations. The Hampden railroad connected with tracks of the Boston and Maine Railroad system, but not with tracks of the New York, New Haven, and Hartford Railroad system. Its construction was not undertaken by the Boston and Maine Railroad directly because of its financial limitations. Accordingly the financing and building of the Hampden railroad was undertaken by an independent corporation, whose promoters were aided actively by Mellen. The object of the Hampden railroad was to connect the Central Massachusetts Railroad, a line leased to the defendant, with the New York, New Haven, and Hartford Railroad at Springfield and thus make a through route from New York to the North Station of the defendant in Boston. The locations of the Hampden railroad as prescribed by public authority consisted of a main line about twelve miles long, starting near Bondsville in Palmer, where connection was to be made with the tracks of the Central Massachusetts Railroad, extending through Belchertown and Ludlow to a point in Chicopee, whence one line ran about four miles, connecting with other lines of the defendant at Chicopee Falls, and another line ran about two and one half miles to Athol Junction in Springfield, connecting with tracks of the Boston and Albany Railroad, with which corporation arrangements were made so that interchange of traffic could be made with the New York, New Haven, and Hartford system at Springfield. The contract, which was entitled "Agreement for Lease," contains among others the following covenants to be performed by the plaintiff:

"First: that it will begin forthwith to construct its railroad beginning at a point about one and a half miles east of the station of Bondsville on the Southern Division of the Boston and Maine

Railroad, in the town of Palmer, thence running through the towns of Belchertown and Ludlow, to connect with the Chicopee Falls Branch of the Boston and Maine Railroad, in the City of Chicopee, and, when requested by the Boston and Maine Railroad, also to connect with the Athol Branch of the Boston and Albany Railroad in the city of Springfield."

"Third: that when completed it will lease said railroad to the Boston and Maine Railroad, subject to the approval of the Board of Railroad Commissioners of Massachusetts, upon terms and conditions as set forth in draft of lease hereto attached and made a part of this Agreement, such lease to be modified in such particulars as the Board of Railroad Commissioners may require."

The plaintiff agreed to build the railroad "to the satisfaction of the Boston and Maine Railroad." The agreement further provided that the cost should be the amount which the vice president and general auditor of the defendant should certify to be its cost, and that its cost should be paid by the issuance of stocks and bonds in such amounts, and the latter to bear such rate of interest, as the defendant might determine. The covenant of the defendant was "to execute the lease, a draft of which is hereto attached . . . , or as the same may be modified by the Railroad Commission of Massachusetts." The agreement for lease was signed for the defendant by Mellen, then its president. The negotiation for the lease had been previously authorized by vote of its stockholders and directors. The agreement was ratified by vote of its stockholders in October, 1911. At the time the agreement for lease was made, no part of the plaintiff's railroad was built, but construction was begun in the autumn of 1911 and the line was completed in 1913 from Bondsville to Athol Junction. Mellen, the president of the defendant, gave specific directions in 1912 that no work be done on the line to Chicopee Falls, but that the line to Athol Junction be built first. The plaintiff and the officers of the defendant agreed upon $3,600,000 as the fair cost of the construction of the Hampden railroad, so far as completed. The plaintiff filed its petition with the railroad commissioners for approval of a lease in September, 1912. No action has been taken on this petition. The plaintiff in 1913, having been theretofore authorized to issue stock to the amount of $1,400,000, filed with the commissioners its petition for approval of an issue

of bonds to the amount of $2,500,000. After several hearings, during the progress of which the plaintiff and officers of the defendant agreed upon $3,600,000 or thereabouts as the cost of constructing the plaintiff's railroad so far as built, the commissioners rendered a decision to the effect that $1,900,000 in bonds might be issued upon condition that within a reasonable time evidence should be presented to the commissioners that the plaintiff corporation was released from all liabilities, except its capital stock, in excess of that amount. This in substance was a decision that the fair cost of the railroad had been $3,300,000, that is, the amount of the capital stock and the authorized issue of bonds. In the summer of 1913 Mellen ceased to be the president of the defendant and his successor and its directors declined to go forward with the lease. The question of ratifying the lease signed by Mellen came before the directors of the defendant and a vote was adopted to the effect that there was no occasion to do anything about a lease because the Hampden railroad was not completed. Neither the contract nor the lease ever has been approved by the public service commission.

A railroad corporation has no inherent or implied power to lease its property. It can only do so when and to the extent and in the manner authorized by the State. *Attorney General* v. *Haverhill Gas Light Co.* 215 Mass. 394. *Middlesex Railroad* v. *Boston & Chelsea Railroad,* 115 Mass. 347.

It is enacted by St. 1906, c. 463, Part II, § 209, as amended by St. 1907, c. 585, § 8, respecting "Two railroad corporations, which are incorporated under the laws of this Commonwealth, and whose railroads enter upon or connect with each other," that "any such corporation may lease its railroad to any other such corporation; . . . Such leases shall be upon such terms as the directors agree, and as a majority in interest of the stockholders of both corporations at meetings called for the purpose approve, subject to the provisions of section sixty-seven of Part I of this act." That section, to which reference thus is made, provides that "A lease . . . of the franchise and property of a railroad corporation . . . shall not be valid or binding until the terms thereof shall, after public notice and hearing, have been approved by the board of railroad commissioners," (now the public service commission).

It is obvious that the statute makes no express provision for

the approval by the public service commission of contracts between railroad corporations to enter into leases. No such approval was sought or given to the contract for lease here in issue. It is plain also that the contract for lease did not attempt to bind the parties to the form of lease thereto annexed. The parties were not legally competent under the statute to bind each other to that or to any form of the lease. The only thing which can have binding force under the statute is a lease approved by the public service commission. In the nature of things all that can be done before that approval is obtained is an agreement to make such an agreement as will meet the approval of the public service commissioners. The parties did not attempt to do more than stipulate that they would execute the lease, draft of which was annexed to the agreement for lease "to be modified in such particulars as the Board of Railroad Commissioners may require," or "as the same may be modified by the Railroad Commission of Massachusetts." This agreement for lease was in terms an agreement to make such a lease as might be approved by the commission after a hearing. The authority vested in the public service commission is to approve terms agreed upon by the parties, not to settle the terms of a lease for the parties. Such an approval is not an idle form or a perfunctory ceremony. One manifest purpose of the General Court in providing that no lease of a railroad shall be valid or binding until approved by a public board was to prevent the inclusion of provisions hostile to the interests of the State or the omission of covenants for the protection of the public welfare. It involves a critical examination of the nature of the property to be leased and all the conditions of the lease, to the end that the general public as well as other interests may be fairly dealt with and adequately protected. It is within the plain purview of the statute to prevent extravagance of expenditure by the lessee in paying an excessive rental and thus preventing the diversion of corporate assets which otherwise might be expended for improving facilities for the service of the public and in reduction of rates.

The draft of lease annexed to the agreement for lease is comprehensive in its scope. It contains ten paragraphs covering the whole field of the subject matter. It is framed in general along the lines of leases heretofore approved under the statute. There

is, however, no general form of railroad lease recognized by the statute or established by the commission so far as shown by this record. The aim of the statute is that each lease shall protect the interests involved by such special provisions as the particular needs of each situation may seem to require. There can be no question as to the duty or power of the commission to approve only such terms of any lease as the exigencies of the special facts and circumstances of each case may demand. Two railroads are not in the position of two parties who have full natural power to contract and require only the assent of some person or body to the validity of their agreement. Railroads have power to deal with the subject of a lease by one to the other only according to the permission of the statute. It is an essential prerequisite to the validity of any bargaining between them respecting a lease that the approval of the public service commission be secured. If that is wanting there is no binding force in their negotiations. Whatever might be said about the power of the two contracting railroad corporations to fix the terms of the lease, it is plain that they possessed no authority to bind the public service commission. The freedom of action of that board in the premises was bounded and limited only by the requirements of the public interests. The terms of the lease in every respect could not be valid or possess binding force until approved by that board. If the draft of lease should turn out not to be satisfactory to the public service commission, it would have to be modified and changed until as a whole it was approved by that commission.

The essence of the contract here in suit, therefore, was an agreement to enter into such a contract, that is to say, such a lease, as the public service commission might approve. As has been pointed out, neither the railroad corporations nor the public service commission have authority to that end. That is in substance an agreement to be bound by a contract the obligations of which are to become effective only when, subject to alterations, it may meet the approval of other persons. The plan for the lease was not and could not in the nature of things be completed until so approved. There was no finality about the matter until such approval. Of necessity under the statute the lease was provisional until such approval. The agreement for lease in its last analysis was to enter into a lease upon such terms as were

satisfactory to the public service commission, which terms if different from those in the draft should be subsequently agreed upon by the directors of each corporation and ratified by the stockholders of each.

It was said in *Lyman* v. *Robinson*, 14 Allen, 242, 254, quoting from *Ridgway* v. *Wharton*, 6 H. L. Cas. 238, 305, that "An agreement to enter into an agreement upon terms to be afterwards settled between the parties is a contradiction in terms. It is absurd to say that a man enters into an agreement till the terms of that agreement are settled. Until those terms are settled, he is perfectly at liberty to retire from the bargain." *Sibley* v. *Felton*, 156 Mass. 273. *Freeland* v. *Ritz*, 154 Mass. 257. *Woods* v. *Matthews*, 224 Mass. 577. *Winn* v. *Bull*, 7 Ch. Div. 29. *Kent Coast Railway* v. *London, Chatham & Dover Railway*, L. R. 3 Ch. 656, 664, 665. This principle of law governs the case at bar. It is an immaterial circumstance that the parties have agreed upon the draft of the lease which they will submit for approval to the public service commission. Its terms can possess no efficacy until such approval. No liability can arise on the lease until it has been approved. It would be a subversion of the purpose of the statute to permit the establishment of liability for breach of a contract to make a lease when the parties could not make the lease itself binding without the intervention of approval by an independent body, and hence could incur no responsibility on the lease without such approval.

It is not the meaning of the statute to prohibit the assumption of any liability on a lease without approval by a public board and yet to permit freely the assumption of large financial liability for breach of a contract to make a lease. This would allow the accomplishment of a result by indirection which is forbidden by open and straightforward methods. Such a result cannot rationally be presumed to have been within the contemplation of the Legislature.

This ground of defence is decisive and it becomes unnecessary to consider the numerous others put forward in behalf of the defendant.

*Exceptions overruled.*