BAGDASAR G. SEMONIAN *vs.* HANNAH BLOOMBERG.

Suffolk.    April 15, 1925. — May 27, 1925.

Present: RUGG, C.J., BRALEY, CROSBY, WAIT, & SANDERSON, JJ.

*Broker*, Commission.

Evidence, at the trial of an action for $1,100 against a woman for services rendered to the defendant in relation to a sale of her real estate, tended to show that the defendant's husband, authorized by her, had agreed to pay to the plaintiff $100 if he procured a purchaser at the price of $16,000 and, if the price was greater, that the plaintiff should also have the excess over $16,000; that the plaintiff procured a purchaser for $17,000; that upon learning of the name of the purchaser the defendant, without terminating the plaintiff's employment, sold the property

to the same purchaser for $16,750 through another broker and refused to pay the plaintiff. A motion for a verdict for the defendant was denied, and the defendant alleged an exception to such denial. The jury found for the plaintiff in the sum of $850. *Held,* that the motion properly was denied and that a finding that the commission had been earned was warranted.

CONTRACT for $1,100, alleged to be due to the plaintiff for services rendered in connection with the sale of certain real estate of the defendant. Writ dated May 1, 1923.

In the Superior Court, the action was tried before *Hammond,* J. Material evidence is described in the opinion. There was a verdict for the plaintiff in the sum of $850. The defendant alleged an exception to the refusal by the trial judge to order a verdict in his favor in the circumstances described in the opinion.

The case was submitted on briefs.

*S. Sigilman,* for the defendant.

*P. P. Coveney,* for the plaintiff.

BRALEY, J. This is an action of contract to recover a commission claimed by the plaintiff by reason of his procurement of a customer for the purchase of certain mortgaged real property, in which the defendant had a beneficial interest, and over which she had control although title to the equity of redemption was in the name of her daughter, one Sadie Lewis. The declaration is in three counts, all for the same cause of action. The first and second counts allege that, if the plaintiff found a customer able and willing to buy for $16,000, the defendant promised to pay him $100, and the amount of the purchase price in excess of $16,000. The third count is on an account annexed for services rendered in connection with the sale, under the conditions stated in the preceding counts. At the close of the evidence the defendant moved for a directed verdict, on the ground that there was not sufficient evidence to warrant a verdict for the plaintiff on the pleadings. The motion was denied subject to his exception, and the jury returned a verdict of $850 for the plaintiff. After the verdict was returned, but before it was recorded, the judge having reserved leave with the assent of the jury to enter a verdict for the defendant as provided in G. L. c. 231, § 120, the defendant moved for

such entry; the motion was denied, and the defendant again excepted. *Kaminski* v. *Fournier*, 235 Mass. 51.

The evidence was conflicting. But, if the jury believed the testimony of the plaintiff, they were warranted in finding the following facts: The plaintiff occupied a store in the premises under lease from a former owner, one Greenfield, who conveyed the property to the defendant's daughter. In January or February, 1923, the defendant and her husband, accompanied by Mrs. Greenfield, wife of the former owner, came to the store and, after some conversation concerning the change of landlords, and making of arrangements for a proper indorsement of the plaintiff's lease, the interview ended. Later in February Mr. and Mrs. Bloomberg again called to collect the rent and the defendant then said that they did not buy the property to keep; they were going to sell again and Bloomberg said "Why don't you try to sell it now, you will get commission, and you are going to get paid" and the defendant said the same thing and also that she left to her husband the transaction of the business and that whatever he did would be satisfactory to her. The plaintiff, in pursuance of the authority thus received, endeavored to get a customer and as a result of his efforts found one David Andonian who agreed to pay $17,000 for the property. He then called the defendant by telephone and told her and her husband of the offer and that he would sell the property if he could get his percentage. The defendant said she could not pay him more than $100 if the price was $16,000, but that he could have all over $16,000 he could get. The next day Bloomberg called and, after some discussion, wrote on a piece of paper authorizing the plaintiff to sell the property on Fairmount Avenue, blocks and stores; if sold for $16,000 plaintiff was to get $100 and also all above that amount, if property sold for more. The plaintiff thereupon offered the property to Andonian who agreed to buy for $17,000. The plaintiff told Andonian he had better take $500 with him and the next day they went together to make this deposit and procure the agreement. The meeting was to be at Andonian's restaurant. The defendant, being informed of this arrangement, said that her husband would

be at Sam Bloomberg's office, 26 School Street, the next morning at eleven o'clock. The plaintiff again told the defendant that he had sold the block but he wouldn't say then for how much but would tell them in the morning when the deposit was made. The plaintiff and Andonian attended at the time and place of appointment, but Bloomberg was not there. The plaintiff called him by telephone and informed him that he and Andonian were there and reminded him of the conversation had the night before, to which Bloomberg replied that he would be there. During this conversation Bloomberg asked "Have you sold it?" and the plaintiff said "Yes," whereupon the former inquired how much money the prospective purchaser had and was told by the plaintiff that he had between $2,000 and $2,500, and was ready to make a $500 deposit, and Bloomberg said "Well, you make more than I do," to which remark the plaintiff replied, in substance, what difference does that make to you, it is what you agreed. Fifteen minutes later Andonian said he couldn't wait any longer; that Bloomberg could come to his place of business and he would pay the deposit there. In the afternoon Bloomberg called at the plaintiff's place of business, where the conversation over the telephone was repeated by the plaintiff and Bloomberg again remarked "You make more than I would, but that is all right." Then the plaintiff suggested that they go to Andonian's restaurant to get the deposit, but Bloomberg said he hadn't time; that he would see his lawyer and make an appointment with him. He again inquired of the plaintiff how much money the customer had and, upon receiving the same answer, asked if he couldn't pay all his equity in the block, to which the plaintiff said "No." Three or four days later Bloomberg saw the plaintiff and asked him to let him, Bloomberg, have the paper he had given the plaintiff, stating that he desired to take it to his lawyer to have it typewritten, and assuring him that it would be returned to him by "the first mail in the morning." The plaintiff said "Are you sure?" to which Bloomberg replied "Yes." The paper, however, was not returned the next morning, and having waited until the last mail in the afternoon the plaintiff again called Bloom-

berg by telephone and was told by him that the lawyer was very sick, but just as soon as he got better the paper would be returned. This was the last the plaintiff heard from the defendant or her agent and he never dealt with him further until he heard they had another broker. The plaintiff never saw Sadie Lewis but once. After the Greenfields got through with the property, nobody but the Bloombergs had anything to do with collecting the rents and the plaintiff's checks were all to the order of Mr. Bloomberg. After plaintiff had delivered the paper to Bloomberg, Andonian told plaintiff that he had signed an agreement to purchase the property and shortly after the agreement was signed the plaintiff had a talk with Bloomberg and demanded his commission, but the latter said he had not sold the property "Whoever told you it isn't true, it isn't so." The plaintiff then said "If you have sold I demand for my commission, because you gave me writing, you told me you would take it back, and would send me by your attorney the writing"; to which Bloomberg again replied that he had not sold the property. This was the last conversation the plaintiff had with Bloomberg. The defendant, however, to whom Mrs. Lewis conveyed the property in April, 1923, had, without the plaintiff's knowledge, entered into an arrangement through another broker April 24, 1923, to sell to Andonian for $16,750, which was followed by a deed to him on or about May 15, 1923.

While there was no agreement that the plaintiff should have the exclusive agency, it is not without significance that the agreement of April 24, 1923, unnecessarily contains a clause that the defendant was to pay a commission of $350 to the second broker.

A review of the evidence, together with the rational inferences to be drawn therefrom, warranted a finding by the jury that the defendant knew that the purchaser, Andonian, was the plaintiff's customer and, without terminating the plaintiff's employment, not only endeavored to escape payment of his commission, but had repudiated her contract, thus preventing him from completing it. It follows that the commission had been earned. *Cook* v. *Fiske*, 12 Gray, 491, 493. *Dowling* v. *Morrill*, 165 Mass. 491. *Cadigan* v.

*Crabtree,* 179 Mass. 474, 483; *S. C.* 186 Mass. 7; 192 Mass. 233. See *French* v. *McKay,* 181 Mass. 485; *Stuart* v. *Newman,* 241 Mass. 33. *Munroe* v. *Taylor,* 191 Mass. 483, and kindred cases, on which the defendant relies, are distinguishable on the present record.

<div align="right">

*Exceptions overruled.*