BARTHOLOMEW J. BRESNAHAN *vs.* BRIGHTON AVENUE BAPTIST CHURCH OF ALLSTON.

Suffolk. April 7, 1932. — May 20, 1932.

Present: RUGG, C.J., CROSBY, WAIT, SANDERSON, & DONAHUE, JJ.

*Broker,* Commission. *Practice, Civil,* New trial, Exceptions.

Where the defendant in an action alleged exceptions to the denial of his motion that a verdict be ordered in his favor and a verdict was returned for the plaintiff, but the judge thereafter allowed a motion by the defendant that the verdict for the plaintiff be set aside and ordered a new trial, which resulted in a second verdict for the plaintiff, the action properly could come before this court only upon exceptions saved by the defendant at the second trial: all that occurred at the first trial, including all rulings of law, was wiped out by the setting aside of the verdict and the ordering of the new trial.

A verdict should have been ordered for the defendant at the trial of an action for a commission by a broker against an incorporated church, on evidence showing merely that the defendant appointed a special committee to sell a lot of its land; that the plaintiff understood that action by individual members of the committee was not of binding force unless ratified by the committee; that the plaintiff talked with one of the members of the committee and then carried on negotiations for a sale of portions of the lot with a representative of a corporation

which was interested in buying the property; that the committee finally decided to sell the lot as a whole only; that the plaintiff then obtained from such member an "asking" price of $125,000; that the corporation's representative stated to the plaintiff that he was "willing to give" $115,000 for the lot, although it was not shown that he had authority from the corporation to make an offer to purchase at $115,000; that thereafter another broker obtained an option from the committee to purchase for $120,000; and that the corporation subsequently purchased the lot through the second broker for $115,000 subject to certain conditions: the evidence did not warrant findings that the plaintiff was the efficient cause of the sale or that the defendant or the members of the committee acted in bad faith.

CONTRACT by a broker for a commission. Writ dated December 19, 1929.

The action first was tried in the Superior Court before *Morton*, J., who denied a motion by the defendant that a verdict be ordered in its favor. There was a verdict for the plaintiff in the sum of $5,736.12. Upon motion by the defendant, the verdict was set aside and a new trial ordered. The defendant filed a bill setting forth an exception, saved at that trial, to the denial by the trial judge of a motion that a verdict be ordered in its favor. This bill was indorsed by the judge, "I allow this bill, if I have jurisdiction and power so to do." Material evidence at the second trial before *Greenhalge*, J., is stated in the opinion. The judge denied a motion by the defendant that a verdict be ordered in its favor. There was a verdict for the plaintiff in the sum of $5,788.81. The defendant alleged exceptions.

The case was submitted on briefs.

*E. V. Grabill & W. A. Brade,* for the defendant.

*E. M. Dangel & L. E. Sherry,* for the plaintiff.

CROSBY, J. This is an action of contract to recover $5,450 which the plaintiff alleges the defendant owes him for services in procuring a sale of certain real estate, in Boston. The case was tried twice before a judge of the Superior Court with a jury, and at each trial a verdict was returned for the plaintiff. On motion of the defendant the first verdict was set aside and a second trial granted. The case is before this court solely on exceptions saved by the defendant at the second trial. "When a verdict is set aside

as a whole on such grounds, all that occurred at the trial producing that verdict, including all rulings of law, is wiped out." *Nagle* v. *Driver*, 256 Mass. 537, 539.

It appears that on February 29, 1924, a corporate meeting of the defendant was held at which there was discussion relating to a new church building. The records of the defendant show that at this meeting a building committee was appointed to examine the situation and make a report at the annual meeting of the church to be held on March 19, 1924. At the meeting on March 19, 1924, the committee recommended the purchase of a new site for the church. It was voted that a new building committee, the members of which were named, be appointed, vested with "unlimited powers" and that it should be "self-perpetuating." A sign was put up on the church property by the committee advertising it for sale, and which recited "Call: J. A. Finley or P. A. A. Killam." In 1925 an exclusive agency for six months was given to Henderson and Ross to sell the property. Afterwards negotiations were had with several brokers and prospective purchasers, including the plaintiff, and with the Standard Oil Company of New York, by various members of the committee.

The first witness, Dr. Killam, the pastor of the church and a member of the committee, was called by the plaintiff. He testified that it was generally assumed by the entire committee that any broker that could put a deal through would be entitled to the commission; that he "told them everybody was on an equal footing." There was no evidence to show that the plaintiff or any one else except Henderson and Ross was given an exclusive agency to sell the property.

The second witness to testify was James A. Finley, a member of the committee, who was called by the plaintiff. He testified that his name was on the sign; that he had known the plaintiff for several years; that he first talked with the plaintiff respecting the desire of the defendant to sell the property in the spring of 1929; that one Hylen, on behalf of the Standard Oil Company of New York, had seen him, and had stated that he had talked with the plain-

tiff; that he (the witness) told Hylen he had better see Bresnahan; that he had talked with other agents respecting the property; that he did not know that Bresnahan was acting for the defendant; that the talk with the plaintiff and others was before the fire which occurred on the property in October, 1929, and was entirely with respect to the sale of the lot by parcels, there being negotiations with the Standard Oil company respecting the purchase of the front portion of the lot only; that after the fire the plaintiff came to his house, and he told him that the church wanted to sell the whole lot; that the plaintiff suggested he get a price at which the church would sell, and he telephoned the chairman of the committee who on his own responsibility suggested a price of $125,000; that he then saw the plaintiff and communicated the price of $125,000 as an "asking price," and the plaintiff said he would get in touch with the Standard Oil company, and called up the company; that the plaintiff did not then communicate any offer from the company to him; that the only offers the plaintiff ever communicated to him from the company were for the front portion of the lot; that the plaintiff never gave him an offer of the Standard Oil company to purchase for $115,000 and never made any reply to the offer to sell for $125,000. This witness further testified that at a meeting of the building committee on November 13, 1929, the chairman reported that Paul and Spear, other brokers, had an offer from the Standard Oil company; that previous to this time the plaintiff had given him a price of only $6 a foot for the front portion of the lot; that he may have said that the plaintiff had been "working on the thing"; that he had not spoken to the plaintiff about the land after Paul and Spear had been given an option; that at a meeting of the building committee on December 10, 1929, the proposition of one Hylen on behalf of the Standard Oil company was spoken of and accepted; that the brokers' commission was discussed; that it was understood by the committee that Paul and Spear were brokers for the church in the transaction; that there was no discussion with reference to the plaintiff at that meeting. This witness further

testified that he saw the plaintiff after this meeting; that he did not tell him about the sale; and that he was the only member of the committee who had dealt with the plaintiff directly.

The third witness was the plaintiff who testified that he was a real estate broker, and a member of the Massachusetts bar, but not in active practice; that he had seen the sign on the property in question, and in March or April, 1929, had talked with Finley about the property; that Finley told him it was for sale; that no price was given at that time; that Finley said "See what you can do about it"; that in April or May there was talk respecting the price; that Finley told him he thought probably $140,000 was the price; that he (the plaintiff) said he would call up Hylen, and did so and told him he had been given a price of $140,000; that he had seen Finley who had charge of the sale; that he saw Finley afterwards and asked him if they would "split the place up" and told him he thought the Standard Oil company might buy "the nose of the piece of land there" and Finley said he would submit the matter to the committee; that the plaintiff told Finley he would get in touch with Hylen; that Finley gave him a plan of the land, and the plaintiff gave it to Hylen; that he talked with Hylen by telephone about every two weeks; that the suggestion about taking a part of the land came from Hylen in May, 1929; that Finley told him the church would. sell five thousand feet at $12 a foot; that he submitted this offer to Hylen and gave him a plan; that Hylen said he would have his engineers go over it and "split it up as they wanted it, and he sent back the plan with seven thousand feet cut off of that, and he said he would give $7 a foot for that." The plaintiff testified that he submitted the proposition to Finley who reported that he thought the church would sell eight thousand feet and for the plaintiff to see Hylen about it; that the plaintiff submitted the offer to Hylen who said he would take it under consideration; that afterwards Finley told him the committee decided not to split up the land; that the last conversation he had with Finley about it was in the summer or early fall of

1929; that the next proposition he had from Finley was sometime before the fire, and Finley told him they had decided not to split up the lot, but wanted to sell the whole of it, and the asking price was $125,000; that the plaintiff submitted this proposition to Hylen several weeks before the fire; that Finley came to see him after the fire and said they were anxious to dispose of the property, and would sell for $125,000; that he called Hylen again, and asked him if he had done anything about it, and Hylen said "No," but they were interested and "we would hear from him shortly"; that the plaintiff did not hear anything more about it except to talk with Finley from time to time, until he heard there were other brokers interested and informed Hylen to that effect. The plaintiff further testified that after the last conversation with Hylen above referred to, and before November 10, 1929, he called Hylen up twice, the last time about November 7 when he told Hylen he heard there were other brokers interested and he thought it "too bad" to be deprived of his work, he had put in a good deal of time on the matter, and Hylen had promised him "that he was to purchase this place from . . . [the plaintiff]"; that Hylen said other brokers had been talking to him and he had received an option from the church; that he then asked Hylen if he was willing to give $115,000 for the property, and Hylen said "Yes," and that the plaintiff went to see Finley and told him what Hylen said and Finley told him he would take it up with the committee; that he heard nothing more about it until he learned that other brokers were ready to go through with the deal; that the talk he had with Finley was on November 7, 1929. He also testified that he had no further talk with Hylen; that about a week later Finley told him "The committee had given to Mr. Paul and Mr. Spear — not Spear, a man named Paul — an option to buy the property"; that Finley told him the option was for $120,000, he said nothing about the offer of $115,000; that this conversation was probably about the first of December. The plaintiff testified on cross-examination, in substance, that Finley would have no authority what-

ever to act for the defendant unless the committee either expressly authorized him to act for it or afterwards ratified his acts.

It appears from the record that the property was finally sold by the committee to the Standard Oil Company of New York for $115,000, subject to the defendant's agreement to remove the building on the land, and also subject to the oil company's obtaining a permit from the city of Boston to maintain a gasoline station on the land, the defendant agreeing to pay Paul and Spear as brokers their commission.

It is the contention of the plaintiff that, having obtained from Hylen an offer to purchase the property for $115,000 and having submitted the offer to Finley, and he having submitted it to the defendant's building committee, which made a sale on those terms later, he is entitled to a commission. It is the contention of the defendant that the plaintiff did not obtain any absolute offer for the purchase of the property, that no offer from the Standard Oil company was transmitted to the defendant by the plaintiff, that there was no evidence of bad faith on the part of the defendant, or of any one representing it, and that the plaintiff was not the predominating and efficient cause of the sale. In the determination of the issues involved the evidence is to be considered in the light most favorable for the plaintiff.

The entire evidence consisted of the testimony of the plaintiff and of Killam and Finley, called by him, both of whom were members of the defendant's building committee, and that of witnesses called by the defendant. There was no evidence which would warrant a finding that the plaintiff had an exclusive agency to procure a purchaser for the property, and we do not understand him to contend to the contrary. The evidence offered by the plaintiff showed that as early as the year 1927 the Standard Oil Company of New York had knowledge of the property, and had considered it as a desirable location for its use. Although Hylen acted as its agent in some capacity, there was no evidence that he had any authority from the company to make a binding offer for the purchase of the property. It

is apparent from the votes of the committee as shown by its records, introduced in evidence by the plaintiff, that no authority to act for it was given to any member of the committee except as expressly voted by it. Its members communicated to the committee from time to time conversations had with brokers concerning the sale of the property, but the plaintiff's testimony shows that he understood that no action taken by a member would have binding force unless voted or ratified by the committee. In order to entitle the plaintiff to recover he was required to offer evidence to warrant a finding that he was the operating, predominating and efficient cause of the sale. He testified that after he saw the sign on the property he talked with Finley, and then went to Hylen with whom he had done some business at other times, and carried on some negotiations with him with reference to the purchase of a part of the defendant's land which finally resulted in the committee declining to sell a portion of it. Afterwards, and before the fire, he obtained from Finley an asking price of $125,000, but no offer to purchase at that price was obtained by the plaintiff. He does not contend that he obtained a customer at that price. He testified that after the fire Finley gave him a selling price of $125,000, and that on November 7, 1929, he called Hylen and asked him "if he [Hylen] was willing to give $115,000 for the property," to which Hylen replied in the affirmative. We are of opinion that this evidence would not warrant a finding that the Standard Oil Company of New York offered to purchase the property for $115,000. The question and answer at most can be construed only as a willingness to purchase. It falls short of proving an offer to buy the property. *Cadigan* v. *Crabtree*, 179 Mass. 474, 485–486. *Woods* v. *Matthews*, 224 Mass. 577, 585. *Russo* v. *Slawsby*, 276 Mass. 126.

Although there was evidence that Hylen was in the employ of the Standard Oil company in some capacity, it does not appear that he was authorized to make an offer on behalf of the company to purchase the property for $115,000. The plaintiff testified "that Mr. Hylen did not say that he had any authority to make a suggestion of a

purchase for $115,000." The witnesses Killam and Finley, both of whom were members of the building committee, called by the plaintiff, testified that Paul and Spear procured from the committee an option dated November 7, 1929, for the sale of the land exclusive of the building. These brokers first showed the option to the Shell Oil Company, a competitor of the Standard Oil Company of New York. Thereafter they interviewed Hylen, and negotiations followed which finally resulted in a sale to that company of the land without the building for $115,000, on condition that the company obtained a permit for installing a gasoline station, the defendant to remove the building within thirty days after the date of the deed, and with the following provision: "The deed to be passed on or before March 10, 1930. The Standard Oil Company to retain $2500 of the purchase price until the building had been removed. We [the defendant] to pay the commission to the brokers for selling the property"; the foregoing terms of sale being recited in the records of a meeting of the building committee held on December 10, 1929.

A careful examination of the entire record does not warrant a finding that the plaintiff was the predominating and efficient cause of the sale. The case is governed in principle by the following cases: *Whitcomb* v. *Bacon*, 170 Mass. 479, *Smith* v. *Kimball*, 193 Mass. 582, *Rich* v. *Behrn*, 248 Mass. 450, *Elliott* v. *Kazajian*, 255 Mass. 459, *Dakin* v. *Visocchi*, 265 Mass. 364, *Delaney* v. *Doyle*, 267 Mass. 171, *Palmer* v. *Cherney*, 270 Mass. 551, *Glendon* v. *Pyne*, 275 Mass. 528, *Russo* v. *Slawsby*, 276 Mass. 126, *Winchester* v. *Missin*, 278 Mass. 427. The present case is distinguishable in its facts from *Rogers* v. *Evangelical Baptist Benevolent & Missionary Society*, 168 Mass. 592, *Woods* v. *Lowe*, 207 Mass. 1, *Cohen* v. *Jackson*, 210 Mass. 328, *Gordon* v. *First Universalist Society of Marlborough*, 217 Mass. 30, *Semonian* v. *Bloomberg*, 253 Mass. 32, *Casey* v. *Fritz Carlton Hotel Co.* 254 Mass. 223, *Waters* v. *Pacific Wool Products Co.* 268 Mass. 83, and cases cited by the plaintiff. There was no evidence which would justify a finding that the defendant or the members of its building committee acted in bad

faith in giving the option to Paul and Spear. *Smith* v. *Kimball*, 193 Mass. 582, 586. *Palmer* v. *Cherney*, 270 Mass. 551, and cases cited at page 556.

At the close of the evidence the defendant moved in writing that a verdict be directed in its favor. The motion was denied subject to the defendant's exception. It is manifest that in view of the entire evidence a verdict for the plaintiff was not warranted; accordingly the defendant's exception to the denial of its request for a directed verdict must be sustained. The other exceptions need not be considered.

Let the entry be

*Exceptions sustained.*
*Judgment for the defendant.*