MARKS BERWIN, administrator, *vs.* CABLE RAINCOAT
COMPANY.

Suffolk.    December 3, 1941. — May 26, 1942.

Present: FIELD, C.J., DONAHUE, DOLAN, & COX, JJ.

*Contract*, Of employment, Performance and breach. *Agency*, Agent's
compensation. *Proximate Cause.*

A finding that an agent of the defendant had performed an agreement
whereby he was to be paid a specified sum of money by the defendant
if he succeeded in inducing United States government officials to
adopt the use of raincoats instead of oilskins was not warranted on
evidence not showing that the agent was the predominating and
efficient cause of such action by the officials.

CONTRACT. Writ in the Superior Court dated October
20, 1937.

The case was tried before *Good*, J.

*J. E. Hannigan*, (*M. L. Orlov* with him,) for the defendant.

*L. Brown*, (*W. J. Barry & R. H. Field* with him,) for
the plaintiff.

DOLAN, J. This is an action of contract in which the
administrator of the estate of William Berwin seeks to
recover $5,000, alleged to be due the plaintiff's intestate,
for services rendered under an oral agreement set forth in
the first count of the plaintiff's declaration, upon which alone
the case was tried, all other counts having been waived.
The jury returned a verdict for the plaintiff. The de-
fendant's exceptions, which bring the case before us, are
to the denial of its motion for a directed verdict, to the
refusal of the judge to instruct the jury in accordance
with its request that "Where there are two agents or agencies
devoting their efforts to accomplishing a certain result and
one agent or agency seeks compensation therefor based
upon the inducing such result, such agent may recover
compensation therefor only if he is the predominating
and efficient cause of the result," and to the denial of its

motion that a verdict be entered for it under the leave reserved by the judge.

The first count of the declaration is as follows: "Count 1. And the plaintiff says that he is the duly appointed administrator of the estate of William Berwin, late of Boston; that during the early part of 1934 said William Berwin entered into an agreement with the defendant whereby said William Berwin was employed to contact the purchasing authorities of the United States government and to seek to induce them to purchase rubber raincoats manufactured by the defendant for which the defendant agreed to pay said William Berwin the sum of Five Thousand ($5,000) Dollars when the government evidenced its interest in said rubber raincoats and purchased the same; that William Berwin did fully and faithfully perform all the obligations imposed upon him by said agreement, and the government did purchase said raincoats; whereupon the said William Berwin became entitled to the payment of Five Thousand ($5,000) Dollars from the defendant; that due demand therefor has been duly made, but the defendant has at all times failed, refused or neglected to pay the same; wherefore the defendant owes the plaintiff the sum of Five Thousand ($5,000) Dollars together with interest."

The evidence in its aspects most favorable to the plaintiff would have warranted the jury in finding the following facts: In 1934 the intestate told one Deutschmann, a witness called by the plaintiff, that he was going to Washington to work on "the raincoat contract"; that "the government previously had been having raincoats made under oil; i. e. oilskins"; that it was his work to try to influence the government to use rubber raincoats; that that was his "work in Washington"; and that if he was successful his fee was to be $5,000 to be paid by the defendant.

The testimony of one Coleman may be summarized as follows: He used the intestate's office with his permission. He went there "practically" every day in 1934. About a year before the intestate died (he died on July 9, 1935) the intestate showed him a sample of rubber coated fabric

and told him that the defendant wanted him "to get the government to adopt this for raincoats," and that if he "got this approved" he did not "have to figure on" the defendant getting the business; that all he had to do was to "get it approved"; and that "if he got the government to requisition coats made of rubber fabric or rubber coated stuff, that he would get $5,000 plus his expenses from Mr. Cable." The intestate had a suite in a hotel in Washington which "was paid for by Thomson & Kelly," whom he was attempting to help sell goods to the Russian government. In the summer of 1934 his "trips to Washington were raincoats and an underwear deal." Less than a month before the intestate died Coleman talked with Robert P. Cable, the president and treasurer of the defendant company, which manufactures rubberized raincoats, gabardines and reversibles, but not oilskins. The intestate was then ill and had a serious operation ahead of him. Cable said that he would see that the intestate had a certain surgeon. The witness then said, "Well you know . . . [he] isn't any too flush at this time," and Cable replied, "he has got a deal in raincoats in Washington he is working on for me that looks as though it's going through and I'll advance the money. If he puts it through he will have $5,000."

One Isaacs testified, in substance, as follows: He had known the intestate for many years. Early in July, 1934, he was sitting with the intestate in his office when Robert Cable came in and said: "William, I have got a tough job for you to do in Washington . . . you know the government has been using oilskins and we think our people haven't got a look-in. Do you think you can get them to use our raincoats again?" The intestate said he would "try and see," and that he supposed he would be compensated properly. Cable replied that he would give him $5,000 if he could "put it over," and would pay his expenses. But as this witness last left his testimony he stated that at Cable's first visit he said to the intestate: "I have got a new proposition for you, see if you can get the government to use raincoats instead of the oilskin that they are using."

There was also evidence of conversations between Cable and the intestate tending to show that the "Rubber Association of America" was working diligently with the government to prepare a rubberized material that the government would find acceptable for raincoats; that Cable told the intestate that if he could interest the government in a hooded raincoat, patent rights to which had been acquired by the defendant, and which, therefore, other raincoat manufacturers would not be able to manufacture, that "would be an opportunity" and that he would get in touch with the defendant's "suppliers" whom he thought would be interested in contributing some money so that the intestate could work on the matter. As a result, a sum of about $1,000 was raised and thereafter Cable paid the intestate from time to time sums of money (in all $1,300) for his expenses, and sent to the intestate at Washington a "sample hooded coat."

In October, 1935, about three months after the death of the intestate, the defendant received "circular bids from the war department to bid on rubber raincoats." It did so, and on October 7, 1935, it received an order "from the United States government" for twelve thousand, five hundred twenty-four "raincoats, rubberized cotton, dismounted type, and three thousand, one hundred ninety-one mounted type" for delivery to the "Philadelphia Quartermasters Department or Depot." This fact was elicited from the defendant's president and treasurer, Cable, in the course of his examination by the plaintiff's counsel. At that point the following took place: "COUNSEL FOR THE PLAINTIFF: And since then, on November 20, 1938, you got another contract for raincoats aggregating $219,000 didn't you? COUNSEL FOR THE DEFENDANT: I object. THE JUDGE: How is that material? COUNSEL FOR THE PLAINTIFF: Well, that he continued to sell the rubber raincoats to the United States Government. THE JUDGE: Is that material in this case? COUNSEL FOR THE PLAINTIFF: I think so, Your Honor, as showing the result of this man's efforts, as we claim. THE JUDGE: I thought your claim was that if Mr. Berwin prevailed upon somebody to change

its policy and substitute rubber coats for oilskins, that he would be entitled to $5,000? COUNSEL FOR THE PLAINTIFF: Yes, and this is evidence that he succeeded in that his principal secured the order for rubber raincoats even as recently as November, 1938. However, if you have any doubt about it, Your Honor, I won't press it. THE JUDGE: There isn't any claim being made here for any orders that this company received? COUNSEL FOR THE PLAINTIFF: No. We claim that we are entitled to this money on this contract he made. I will reserve any further examination of this gentleman for later."

It is unnecessary to decide whether the plaintiff must therefore be held to have conceded that the actual agreement involved was that the defendant would pay the intestate $5,000 if he succeeded in inducing the government officials to change their policy and to substitute rubberized raincoats for oilskins, since we are of opinion that upon the evidence the verdict for the plaintiff must have been based upon a finding that that was in fact the agreement made between the intestate and the defendant. No question of law was raised at the trial by the defendant as to this variance between the allegations of the first count of the plaintiff's declaration, upon which alone he relied, and the proof. Compare *Bucholz* v. *Green Bros. Co.* 272 Mass. 49, 55. The contract thus proved was a promise of the defendant to pay the intestate, conditional upon the change of policy, to which we have referred, of which the intestate was the efficient cause. In order to recover, therefore, the plaintiff was bound to prove that the intestate was the predominating and efficient cause of the action of the war department in requisitioning rubberized raincoats in October, 1935, instead of oilskins. *Whitcomb* v. *Bacon,* 170 Mass. 479, 482, 483. *Bresnahan* v. *Brighton Avenue Baptist Church of Allston,* 279 Mass. 300, 308, and cases cited. *John T. Burns & Sons Inc.* v. *Hands,* 283 Mass. 420, 422, 423. *Kacavas* v. *Diamond,* 303 Mass. 88, 92. "An agent whose compensation is conditional upon his accomplishment of a specified result is entitled to the agreed compensation if, and only if, he is the effective cause of accom-

plishing the result." Am. Law Inst. Restatement: Agency, § 448.

We are of opinion that it could not have been found properly that the efforts of the intestate were the predominating, efficient cause of the accomplishment of that which was required of him in order to entitle him to be paid in accordance with the promise of the defendant. The evidence of his activities consists largely of letters interchanged between him and Cable and of conversations had between them. For the most part the communications related to the matter of having the war department officials adopt the "hooded raincoat," which they never did, and as to which the intestate admitted failure. In July, 1934, however, a number of letters were exchanged in which the defendant did stress the advantages of rubberized raincoats over oilskins, and sent the intestate samples of rubberized fabrics. In that month the defendant wrote to the intestate that it had been advised that "the 62,000 coats have been awarded to the oil-slicker people, just as we expected." In December, 1934, the defendant wrote to the intestate asking him to put all his efforts "behind the hooded coats for the C. C. C." In a letter without date the intestate related that he had a very encouraging conference with General Gibson and officers of the quartermaster department, at which he showed them the hooded coat and was asked to leave it, which he did. He hoped to prevail upon the department to approve that coat for the "C. C. C." In this letter he stated that in his opinion the rubberized coat for the regular army would ultimately be adopted. On this point he was "almost assured." On November 29, 1934, referring to this previous letter, he set forth that he forgot to mention that the war department was not interested in the hooded raincoat, and if it was adopted at all it would be on account of the "C. C. C."; that he would "be on the job from day to day and hope[d] to bring back some encouraging news." Later, the intestate told the defendant that he was much disappointed that he had not been able "to put over the hooded coat."

Other than the statement of the deceased that he was

"almost assured" that rubberized coats would be adopted ultimately by the government, there is no evidence of any actual discussion or conversation of the intestate with any officials of the United States with reference to the adoption of rubberized raincoats. On the other hand, there was documentary and other evidence tending to show that The Rubber Manufacturers Association, Incorporated, with offices in New York City, had been working for some time on the development of a rubberized raincoat that would be suitable for the needs of the army. Prior to July, 1934, they had been working for some time on the matter. On October 25, 1934, the assistant secretary of war, responding to a letter written by the secretary of the National Rainwear Manufacturers Association protesting against the purchases by the army of oilskins, stated in substance that during the world war and for some years thereafter the rubberized raincoat was standard for the army, but was found unsatisfactory for military use; that some work had been done with a view to developing a satisfactory rubberized raincoat in which The Rubber Manufacturers Association, Incorporated, had coöperated and that until recently the efforts of that association "appear to offer promising results"; that during 1932, that association had arranged with the Hodgman Rubber Company of Framingham for the manufacture of a number of rubberized raincoats; that they were tested by the army and disadvantages revealed by the tests had been made known to that association during May, 1934; that the department was awaiting receipt of new or modified experimental types to be offered by that association; and that until "a rubberized raincoat superior in all respects to the oilskin type has been developed, the War Department will hold to the present standard."

On June 26, 1935, General Gibson, chief of the purchasing department of the quartermaster corps, wrote to The Rubber Manufacturers Association, Incorporated, in substance as follows: "This office takes pleasure in informing you of the adoption, by the War Department, of the rubberized raincoat recently developed through the joint efforts of the Rubber Manufacturers' Association and the

Philadelphia Quartermaster Depot. The coat has been adopted as a 'development type,' which signifies that the procurement of a number is authorized for issue to troops . . . the coat remaining in a service test status for the period of one year. This office greatly appreciates the personal interest displayed by you in this development and the preliminary work which you performed so efficiently, as well as the interest and cooperation of your Association in making it possible to obtain a more suitable and satisfactory raincoat for the Army." There was no evidence to show that the intestate ever had any relations with The Rubber Manufacturers Association, Incorporated, or with officials of the Philadelphia quartermaster depot. In the light of all the evidence bearing upon the causes which induced the war department to determine in 1935 to adopt rubberized raincoats as a "development type," we are of opinion that the jury could not have found properly that the intestate was the predominating, efficient cause of its action.

It follows that the defendant's motion for a directed verdict should have been granted. It is unnecessary to consider its other exceptions.

*Exceptions sustained.*
*Judgment for the defendant.*