GEORGE A. WOODS *vs.* NATHAN MATTHEWS & another, trustees.

Suffolk. March 23, 1916. — June 20, 1916.

Present: RUGG, C. J., LORING, BRALEY, DE COURCY, & PIERCE, JJ.

*Agency,* Broker's commission. *Broker.*

Where the owner of a hotel employed a real estate broker to find a tenant for it and the broker procured a person who executed with the owner a "memorandum of agreement" drafted with great care and setting forth certain terms of a proposed lease to be executed .by the parties and "the principal points of their

joint understanding," but which did not contain "all that the lease was intended to contain" and left the unexpressed terms of the lease to be agreed upon subsequently between the parties, and where the parties subsequently failed to agree on such terms and after certain negotiations the proposed tenant refused to take a lease of the hotel on the terms required by the owner, the broker cannot recover a commission for his services, because, in an action brought by him against the owner for such a commission, there is no evidence that the proposed tenant was ready and willing to become a tenant of the hotel on the owner's terms or that the owner accepted him as such a tenant.

CONTRACT against Nathan Matthews and George E. Howe, trustees, to recover the sum of $6,581.52 alleged to be due to the plaintiff for services rendered to the defendants by the plaintiff as a real estate broker in procuring a person ready and willing to become a tenant of the Hotel Oxford in Boston under a twenty year lease on certain specified terms, who was accepted by the defendants as such tenant. Writ dated December 4, 1912.

The declaration originally contained two counts. Afterwards a third count was added by amendment, which was as follows:

"Count 3. The plaintiff says that he is a real estate broker with a usual place of business in Boston in the county of Suffolk; that the defendants as trustees were the owners of certain hotel property known as the Hotel Oxford situated on the corner of Huntington Avenue and Oxford Terrace, Boston, Massachusetts, and consisting of a five story brick building and certain land, the entrance of said building being numbered 40 Huntington Avenue.

"And the plaintiff says that the defendants were desirous of finding a tenant for said premises and that from about the fourteenth day of October, 1912, acting as broker in the employ of the defendants, the plaintiff expended a large amount of time and labor and finally procured and introduced to the defendants a man by the name of Archie E. Hurlburt; that thereafter on the twenty-sixth day of October, 1912, the defendants and the said Archie E. Hurlburt entered into a written agreement for the leasing by the defendants to the said Hurlburt of the said building. A copy of said agreement omitting the signatures is hereto annexed marked 'A.'

"And the plaintiff says that the defendants agreed at the time they employed him to pay him the usual and ordinary commission for the services rendered by the plaintiff to the defendants; that

the plaintiff has in all ways fulfilled the terms of his agreement but that the defendants have refused to pay him.

"Wherefore the plaintiff says that the defendants owe him the sum of six thousand five hundred eighty-one dollars and fifty-two cents ($6,581.52) being said reasonable and proper commission, with interest from the 26th day of October, 1912.

"This added count is for the same cause of action as counts 1 and 2."

The copy of the agreement annexed to the declaration, omitting the signatures, was as follows:

"Memorandum of Agreement made this twenty-sixth day of October, A.D. 1912, by and between Nathan Matthews and George E. Howe, Trustees, parties of the first part, and Archie E. Hurlburt, party of the second part.

"The parties of the first part agree to lease to the party of the second part the hotel property known as the Hotel Oxford situated on the corner of Huntington Avenue and Oxford Terrace, Boston, Mass., consisting of five story brick building and about 24,706 square feet of land, with entrance being numbered 40 Huntington Avenue.

"The above described property to be rented on a lease of twenty (20) years from November 1, 1912, to include land upon which the hotel stands and space of ten or fifteen feet in the rear, also right of way over 20 foot passageway to the east of the building, and a right of light and air over one-half of the park in the rear.

"And the party of the second part agrees to pay therefor an annual rental of Twenty thousand dollars ($20,000) for the first two (2) years, Twenty-five thousand dollars ($25,000) for the next three (3) years, and an annual rental of Thirty thousand dollars ($30,000) for the balance of the term of the lease, and all taxes and fire insurance premiums, said rent to be paid in monthly installments on the first of each and every month. Taxes and insurance to be paid monthly pro rata. If his gross receipts exceed Two hundred thousand dollars ($200,000) per annum for the first or second year or both, the excess over that amount in each year up to Five thousand dollars ($5000) shall be paid at the end of each year by the party of the second part as additional rent, and if at the end of the third, fourth, and fifth years respec-

tively the gross receipts shall exceed the sum of Two hundred fifty thousand dollars ($250,000) the excess over that amount in each year up to Five thousand dollars ($5,000) shall be paid by the party of the second part at the end of each year as additional rent.  At the end of ten (10) years an appraisal shall be made to settle an increase of rent for the balance of the term of the lease. Said increase to be at the rate of six per cent (6%) on the excess of the value of the land as made in said appraisal over the sum of $300,000.  And said party of the second part agrees to pay said increase if any there be as herein specified.

"The liquor license to be taken over and paid for in cash by the party of the second part at its present value to be bought back by the party of the first part upon cancellation or expiration of the lease at its then value.

"And the party of the second part shall have the right to purchase such of the present furniture as he may desire to be taken over on appraisal at a fair value in use.  And the party of the second part agrees to buy the stock on hand at cost, to be paid for in cash.

"And the parties of the first part agree that the sum of Ten thousand dollars ($10,000) shall be allowed out of the first year's rent for alterations of the entrance or entrances and for the renovation of the building, provided the party of the second part spends that amount.  And said party of the second part agrees to change the entrance on plans approved by the parties of the first part, said change to be carried out under the supervision of an architect satisfactory to the parties of the first part.

"In case of loss or damage by fire the parties of the first part will restore the building provided the public authorities permit and the cost does not exceed the amounts paid by the insurance companies, a proportionate part of the rent to be abated during reconstruction.

"It is understood that the lease is made subject to existing leases for stores and suites which leases shall be assigned to the party of the second part.  All rents and accounts receivable November 1, 1912, shall be collected by the party of the second part and paid to the parties of the first part.

"It is agreed by both parties that the within agreement is a memorandum of the principal points of their joint understanding

and that the lease shall contain the usual and customary covenants for the lease of a hotel although not specified herein, which lease shall be executed by both parties to this agreement on or before November 1, 1912."

In the Superior Court the case was tried before *King*, J. The evidence is described in the opinion. At the close of the evidence the judge on the defendants' motion ordered a verdict for the defendants on the first two counts on the ground that there was no evidence warranting a verdict for the plaintiff on either of those counts.

The judge submitted the case to the jury on the third count, which he "construed as charging an agreement by the plaintiff to procure a tenant for the Hotel Oxford," and, subject to the defendants' exception, gave to the jury the following instruction:

"5. If you find that the defendants employed the plaintiff to procure a tenant or lessee, or to procure a person who would take a lease of the Hotel Oxford, and that the plaintiff, acting solely in the interest of the defendants, secured Hurlburt to take a lease, and Hurlburt accepted the terms of the defendants and was accepted as a person able, ready, and willing to take a lease by the defendants, then, in the absence of any misrepresentations on the part of the plaintiff, you must find a verdict for the plaintiff."

The judge also submitted to the jury three special questions, which, with the answers of the jury, were as follows:

"1. If any agreement was made between the plaintiff and the defendants as to the nature of the plaintiff's employment, what did the plaintiff and the defendants then understand that the plaintiff was employed to do?"

The jury answered: "The plaintiff was employed to procure a tenant for the Hotel Oxford."

"2. Were the defendants induced to sign the so called memorandum or contract of October 26, 1912, by reason of any false or fraudulent representations by the plaintiff Woods?"

The jury answered: "No."

"3. While the relation of agent and principal existed between the plaintiff and the defendants, was the plaintiff at any time lacking in any respect in fidelity to his principal?"

The jury answered: "No."

The jury returned a verdict for the plaintiff in the sum of $7,091.58; and the defendants alleged exceptions.

*W. G. Thompson,* (*G. E. Mears* with him,) for the defendants.

*D. E. Hall,* (*F. Shurtleff* with him,) for the plaintiff.

PIERCE, J.　Under the third count, the only one finally submitted to the jury, the plaintiff declared and the jury expressly found that he (the plaintiff) was employed by the defendants to procure a tenant for the Hotel Oxford.

It was admitted that the plaintiff under his employment introduced to the defendant Matthews one Hurlburt, a person who had in mind the leasing of the Hotel Oxford; that the defendants and Hurlburt discussed the terms of a possible lease; that they agreed as to "the principal points;" that Hurlburt withdrew from the negotiations before there was a final determination of all the questions in issue between them; and that Hurlburt never, in fact, became a tenant.

It was further admitted that on October 26, 1912, the defendants and Hurlburt executed and delivered the one to the other a paper which was drawn by the plaintiff and entitled "Memorandum of Agreement." The plaintiff contends that this memorandum of agreement, in connection with the acts and declarations of the parties to it, warrants, if it does not require, a finding of fact that Hurlburt was ready, willing and able to take a lease of the Hotel Oxford on the terms of the defendants, and, also, that the defendants came to an agreement with him to accept him as their tenant and began to make out a lease to him.

There was evidence that the memorandum was drafted with great care to express accurately and to cover the main points of their understanding. To provide for points undecided and then under discussion, there was inserted in the agreement, by the plaintiff, a paragraph that read: "It is agreed by both parties that the within agreement is a memorandum of the principal points of their joint understanding and that the lease shall contain the usual and customary covenants for the lease of a hotel although not specified herein, which lease shall be executed by both parties to this agreement on or before November 1, 1912."

In the memorandum the defendants "agree to lease to the party of the second part [Archie E. Hurlburt] the hotel property known

as the Hotel Oxford . . . to be rented on a lease of twenty (20) years from November 1, 1912," and "the party of the second part agrees to pay therefor an annual rental of Twenty thousand dollars ($20,000)" in the manner and form therein set down.

It is unnecessary to refer further to the contents of the memorandum otherwise than to state that it contained provisions relating to the transfer of the liquor license, to the purchase of the furniture of the hotel, to a proposed alteration of the entrance or entrances, and for the renovation of the building, to the obligation to restore the building in case of fire, and to an abatement of rent during restoration.

There was evidence that, following the execution of the memorandum agreement the defendants congratulated the plaintiff "upon the closing of the matter up so promptly;" that they urged the plaintiff to make a speedy delivery of Hurlburt's original; that they dictated a letter for the plaintiff to send to Hurlburt wherein it was stated that the defendants "have just decided to accept the contract and have signed both copies;" that Hurlburt admitted that he had signed a contract to lease the Oxford; that Matthews said "he was ready and willing to put the deal through on the basis of the contract if Hurlburt could be prevailed upon."

As has been stated, the customer, Hurlburt, refused to go on before he and the defendants had come to an agreement upon the terms which were under discussion at the time of the execution of the memorandum of the agreed terms. It is contended by the defendants that the memorandum or contract by its very statement that it "is a memorandum of the principal points of their joint understanding," uncontrovertibly establishes that it was a preliminary contract only, and that Hurlburt upon the entire evidence could not as a matter of law have been ready, willing and able to become a tenant of the defendants upon terms then the subject of controversy between them. It also is argued that the defendants did not upon the entire evidence accept Hurlburt as a tenant otherwise than upon the implied condition that the terms of the lease should be finally agreed upon.

It is plain, as the presiding judge stated to the jury, "that the memorandum, upon the face of it, does not contain all that the lease was intended to contain." It is equally plain that there

was not at law or in equity an enforceable right or obligation created by or arising from the memorandum of agreement to bind or to benefit either party to the instrument. See *Roberts* v. *Lynn Ice Co.* 187 Mass. 402; *Bogigian* v. *Booklovers Library,* 193 Mass. 444; *Ridgway* v. *Wharton,* 6 H. L. Cas. 238.

The plaintiff does not rely upon proof or contend that the defendants and Hurlburt thereafter ever came to an agreement and understanding as to points and terms left undecided and unadopted at the execution of the agreement, but states, as his position, that "it is quite immaterial whether the contract of October 26 was legally binding upon the parties to it or not, and it was also immaterial whether equity would enforce specific performance of it or not. . . . The whole question is whether Matthews and Howe accepted Hurlburt as a person able, ready and willing to become their tenant on their terms."

It was entirely possible for the defendants to have said to the plaintiff, as he says in illustration of his position, "Mr. Woods, you have fulfilled your duty; you need not serve us longer; we accept Mr. Hurlburt as a person procured by you, able, ready and willing to become our tenant and to enter into such a lease as we see fit to draw." The reported facts do not warrant a finding of fact that the defendants accepted Hurlburt as a tenant, or that Hurlburt ever was able, ready and willing to become a tenant of the defendants under such a lease as the defendants might see fit to draw. To say that Hurlburt was ready and willing to become a tenant upon such terms as the defendants might draw, is to contradict the written "memorandum of agreement," and is to say that Hurlburt was without real voice in the apparent negotiations as to the terms of the proposed lease that followed the execution of the "memorandum of agreement" to the time when Hurlburt refused longer to treat with the defendants.

In relation to the continuance of the negotiations between the defendants and Hurlburt, the bill of exceptions states: "The plaintiff contended that no negotiations between the defendants and Hurlburt after October 26 were legally material or competent, and objected to the introduction of any evidence tending to show that such negotiations occurred after October 26. The court having overruled these objections of the plaintiff, the plaintiff did not dispute that certain negotiations between the defend-

ants and Hurlburt continued until November 12, when they were broken off by Hurlburt."

It would seem to be clear that readiness, willingness and ability to become a tenant upon the defendants' terms, in the absence of an express understanding otherwise, presupposes and implies that the terms which are to govern the rights of the parties are or are to be defined, and that so long as such terms are under discussion there can be in the nature of things neither a readiness nor willingness to become a tenant on the defendants' terms, or an acceptance of such a person as a tenant. *Fitzpatrick* v. *Gilson,* 176 Mass. 477. *Roche* v. *Smith,* 176 Mass. 595. *Cohen* v. *Ames,* 205 Mass. 186. *Goodnough* v. *Kinney,* 205 Mass. 203. *Clark* v. *Bonner,* 217 Mass. 201.

Moreover, if the "memorandum of agreement" be considered neither as a final nor as a preliminary contract, but is to be taken as a memorandum merely, that is to say, as admissions of the facts therein stated in connection with all the other evidence favorable to the plaintiff's contention, the entire evidence falls short and does not warrant a jury in finding that Hurlburt was able, ready and willing to become a tenant on the terms of the defendants, or that the defendants were in the position of having accepted him as such. Upon this issue a verdict should have been directed for the defendants.

It is unnecessary to consider the remaining exceptions taken to the admission or rejection of testimony, as well as to the rulings and refusals to rule of the presiding judge.

The exceptions are sustained and judgment is to be entered for the defendants under St. 1909, c. 236.

*So ordered.*