HARRY ROSENFIELD & another *vs.* UNITED STATES TRUST COMPANY & others.

Suffolk. February 6, 1935. — March 25, 1935.

Present: RUGG, C.J., PIERCE, FIELD, DONAHUE, & QUA, JJ.

*Contract,* What constitutes. *Frauds, Statute of.*

A finding that a binding contract for the leasing of certain business property was made was not warranted where it appeared that, after discussion of terms, the parties had a meeting at which the proposed lessee said, "Let's check and see if we have got everything smoothed

out so there is no mistake," and thereupon read sundry fundamental terms from a memorandum which he had prepared, saying as to each item, "There is nothing else"; and that the proposed lessor said as to each item so read, "That is all right.  That is all settled," and the next day said, "the deal is closed"; but it also appeared that in view of further negotiations, and discussions of a draft lease, after such meeting the parties had not come to an agreement with respect to the installation of a new store front in the building on the property, the furnishing of heat therein, the payment of water charges and sundry other material terms at a time when the proposed lessor withdrew from the negotiations and leased the property to a third person.

It also appearing that at such meeting the proposed lessor declined the suggestion of the proposed lessee that "a short form of agreement" be executed and said that he would have a lease prepared, to which the proposed lessee assented, a finding that a binding contract between the parties was made was not warranted for the further reason that the parties did not intend to be bound until a formal instrument in writing, the lease, should have been executed.

A memorandum of an agreement, even if otherwise sufficient, did not satisfy the statute of frauds where it was signed at a time when the parties had settled certain fundamental terms of the agreement, but had not settled certain other material terms thereof.

BILL IN EQUITY, filed in the Superior Court on May 8, 1933.

The suit subsequently was amended into an action at law.  It was tried in the Superior Court before *Morton, J.,* who ordered a verdict for each defendant.  The plaintiffs alleged exceptions.  Material evidence is stated in the opinion.

*D. Stoneman,* (*A. A. Tepper* with him,) for the plaintiffs.

*Lee M. Friedman,* (*F. L. Kozol* with him,) for the defendants.

PIERCE, J.  This is an action at law in contract, wherein the plaintiffs seek to recover damages for the breach of an agreement to lease to them certain premises known as number 42 Winter Street, Boston.  The action was instituted originally by a bill in equity for specific performance, but was subsequently amended into its present form by leave of court on the plaintiffs' motion.  The case was tried in the Superior Court to a jury.  The pleadings are made a part of the plaintiffs' bill of exceptions.  Among other things the defendants pleaded the statute of frauds.  "At the trial no paper or document was displayed, exhibited, offered

or marked either as an exhibit, as an exhibit for identification or otherwise containing any signature, initials or handwriting of any of the defendants." At the close of all the testimony the defendants presented written motions that a verdict be directed for each defendant. The judge allowed the motions, and pursuant thereto the jury returned a verdict for each defendant as directed. The substitute bill of exceptions sets forth all the evidence material to the questions presented.

The evidence in its aspect most favorable to the plaintiffs, *Metayer* v. *Grant*, 222 Mass. 254, on the basis that all evidence unfavorable to the plaintiffs may be disbelieved, *Lindenbaum* v. *New York, New Haven & Hartford Railroad*, 197 Mass. 314, warranted the jury in finding the following facts: In April, 1933, the building in question was vacant and needed extensive alteration before it would be fit for occupancy. Abraham C. Ratshesky, individually, was the owner of one undivided half interest, and said Abraham C. Ratshesky, Theresa S. Ratshesky, Alan R. Morse and the United States Trust Company were the owners, as trustees under the will of Israel A. Ratshesky, of the other undivided half interest. Abraham C. Ratshesky was chairman of the board of directors of the United States Trust Company, with general oversight of the business of the bank, subject to the executive committee and the board of directors. He had power, however, to carry on the routine work of the bank as its representative between the meetings of the board. Morse was at all times vice-president and treasurer of the trust company acting with said Ratshesky as the administrative trust officer of the company. Theresa S. Ratshesky was the widow of the said Israel A. Ratshesky.

Early in April, 1933, one William L. Berger, an attorney acting in behalf of the plaintiffs, discussed with Morse the prospect of securing a lease of the first floor and basement of the building in question for the purpose of conducting therein a jewelry business. Morse informed Mr. Berger that the trustees were primarily interested in renting the whole building, and that Abraham C. Ratshesky wanted to rent the whole building. On April 18, 1933, Mr. Berger

again saw Morse and told him that the plaintiffs would be
willing to pay $15,000 for one year, and "$20,000 for four
years," with an option in the lessors to take seven per cent
of the gross sales, the lessors to put in a store front and to
supply heat.  The next day, April 19, 1933; Morse tele-
phoned to Mr. Berger that Ratshesky would rent the store
and building from June 1 until December 31, "at the rate
of $15,000 per annum, and at the rate of $20,000 for four
years and five months," with the option in the lessors "to
take seven per cent of the gross sales," the lessees to pay a
deposit of $1,250 and the lessors to have the right "to take
gross sales monthly."  He wanted semiannual reports.  The
lessors would put a "bang up" store front in and "build a
nice place" for the lessees so they could do business.  Mr.
Berger in reply said that he would talk with his people, and
asked Morse "to come in town so we could discuss it fur-
ther."  Later that morning Morse came in to the office of
Mr. Berger.  They talked about the bankruptcy of Homer's
Inc.  Mr. Berger said that the business on Summer Street
was not very good, resulting in bankruptcy for Homer's
Inc.; that Summer Street was not the proper location "for
their type of jewelry store"; that Homer's Inc. had been
on Winter Street and "that was where they belonged";
that they had assurance of financial backing; that some-
body would put up money to buy the assets of Homer's
Inc. back from the bankruptcy court, buy the stock and
fixtures and good will, name and accounts receivable; and
that this party was going to advance about $250,000 to
keep the place adequately stocked so that sufficient business
could be done.  Mr. Berger then suggested a new store
front "like Nisley's."  Morse said that Ratshesky would
refer the matter of front to one Graham, and that every-
thing referring to the architecture of the building was
referred to Graham.  At a later conference the same day
Mr. Berger's client, Levine, said he would like to call in for
suggestions an architect named Bassett.  They discussed
where the entrance was to be and decided that it should be
on the side of the store toward Washington Street.  They
also discussed heat, and the question of examining the books

of the lessees.    Mr. Berger and Morse each made notes at these conferences on April 19 of "terms, and conditions" which were to be contained in the lease.

On April 20, Mr. Berger and Levine met Morse and Ratshesky.    The subject matter discussed with Morse on April 19 was rediscussed with Ratshesky.    At the close of the talk Mr. Berger said to Ratshesky, "Well, suppose we draw up a short form of agreement now as long as we have agreed on the terms?"    Ratshesky replied, "There is no sense in that because I will refer it to counsel immediately and they will draw a lease and it will be just as easy to draw a lease as to draw a short form because everything in the short form has got to be in the lease."    Mr. Berger then said, "Let's check and see if we have got everything smoothed out so there is no mistake."    Mr. Berger read each item from his "memo" and said as to each, "There is nothing else."    Ratshesky replied, "That is all right.    That is all settled," and he put his name on the bottom of the sheet that Morse had given to him and handed it to Morse, saying, "Here, Alan, give that to Norman Walker and have him draw a lease."

On April 21, Mr. Berger told Ratshesky that Mr. Spinoza, an attorney for the plaintiffs, was going to see referee Black in an effort to buy the assets of Homer's Inc., including the good will and accounts receivable, at a private sale rather than at an auction sale.    Mr. Berger thought it would be a good idea to have some sort of letter from Ratshesky to Black advising him, as referee, that the deal had been closed.    Ratshesky said that there was no need of any letter, "You just tell Mr. Black that the deal is closed and then if he insists, why come back and I will give you a letter."    That afternoon Mr. Berger told Ratshesky that "we would have a sketch of the store front for him."    He said the "deal was closed and that was all there was to it, and nothing was said about the formality that the deal would have to take, whether it was necessary to get in touch with other of the defendants or the bank representatives."    On that day Mr. Berger brought to Ratshesky Bassett's sketch, plan and estimate of what the work would cost — $4,300

exclusive of removing a pillar. Ratshesky said that was a lot of money. That evening in Ratshesky's office, sketches from Graham's office were considered in connection with a sketch from Bassett's office. On April 24, Mr. Berger had a talk with Ratshesky who said he was working on Mr. Berger's proposition and had the plans and specifications in his office. On April 27, at a conference, Ratshesky said "that they had been going over the figures and they did not think they wanted to spend $5,100 on this front which was the final figure he had received from Bassett." He said that "he would go fifty-fifty" with them, and asked if they could not put down $1,000 toward their half of the store front and pay the balance $100 a month. Ratshesky said that it would be unnecessary to put the arrangement in the lease, and that he would "give a separate letter to this effect." Mr. Berger said, "Wait until I get that down," and then wrote down substantially what was agreed upon. Ratshesky took a little piece of paper from a box on his desk and wrote it down. Between April 28 and May 1, one Hartstone, an attorney for the defendants, gave Mr. Berger a first draft and a second draft lease (respectively Exhibits 1 and 2). Mr. Berger and Mr. Hartstone met several times, discussed the terms of these drafts and made changes and additions thereto. The subject matters under consideration were the method of supplying heat, the amount which the plaintiffs were to pay therefor, if anything, the question of liability for water charges, the medium in which the rent payments were to be made and other details. At some time between May 1 and May 3 the defendants withdrew from further negotiation and leased their building to others. There was evidence to corroborate the testimony of the plaintiffs' witness Mr. Berger, and evidence that the plaintiffs were ready, able and willing to perform their part of the agreement. "It is agreed that the plaintiffs had evidence tending to show that they had suffered appreciable damage."

On the above facts the fundamental question is, Had the parties bound themselves irrevocably to a contract, before the defendants, on May 1 or 3, notified the plaintiffs that

the "deal was off"?  If they had not bound themselves by
mutual assent to the contract set up by the plaintiffs, it is
apparent that the question whether a memorandum sat-
isfying the statute of frauds had been signed, or, if signed,
delivered, is immaterial.

From the facts stated it is clear that the parties, prior to
April 20, 1933, contemplated in the future the execution of
a lease incorporating terms to be agreed on by the parties.
It is undisputed that on said April 20 Ratshesky refused
to execute "a short form of agreement," but informed Mr.
Berger, who acted on behalf of the plaintiffs, that a lease
would be drawn later.  Normally the fact that parties con-
template the execution of a final written agreement justifies
a strong inference that the parties do not intend to be
bound by earlier negotiations or agreements until the final
terms are settled.  *Lyman* v. *Robinson*, 14 Allen, 242, 254.
*Geo. W. Wilcox, Inc.* v. *Shell Eastern Petroleum Products,
Inc.* 283 Mass. 383, 387.  Said fact does not conclusively
establish such intention.  *Donovan* v. *Freeman*, 263 Mass.
561, 562.  If all the material terms which are to be incor-
porated into a future writing have been agreed upon, it
may be inferred that the writing to be drafted and delivered
is a mere memorial of the contract, which is already final by
the earlier mutual assent of the parties to those terms.
*Beach & Clarridge Co.* v. *American Steam · Gauge & Valve
Manuf. Co.* 202 Mass. 177, 182.  *Duggan* v. *Matthew Cum-
mings Co.* 277 Mass. 445, 450.  A failure of the parties to
agree on material terms may not merely be evidence of the
intent of the parties to be bound only in the future, but may
prevent any rights or obligations from arising on either side
for lack of a completed contract.  *Brighton Packing Co.* v.
*Butchers' Slaughtering & Melting Association*, 211 Mass. 398,
405.  *Woods* v. *Matthews*, 224 Mass. 577, 583–584.  The
plaintiffs rely on the facts that on April 20 at the meeting
between the parties Ratshesky checked the items as they
were read by Mr. Berger from his memorandum and, reply-
ing to Mr. Berger's comment on each item, "There is
nothing else," said, "That is all right.  That is all settled,"
and later stated that "the deal was closed."

On these facts, if they stood alone, the jury would have been warranted in finding that the parties at that time entered into a binding agreement. But it is apparent from the negotiations that up to that point all material matters had not been agreed upon. This being an indisputable fact, there was at that time no completed contract enforceable at law or in equity. *Woods* v. *Matthews*, 224 Mass. 577, 583, 584. No agreement had then been reached in the matter of the new store front. In this respect each party had submitted the matter to his own architect, but no plans had been submitted by the architects, much less accepted by the parties, by April 20. Nor had the cost of such work been agreed upon. Moreover, though the plaintiffs contend that prior to April 20 it was agreed that the defendants were to pay the cost of the store front, the plaintiffs, on April 27, apparently without objection, agreed to pay one half of an estimated cost of $5,100. Similarly, though the plaintiffs contend that the defendants had agreed to furnish heat at their own expense, the plaintiffs later agreed to pay for heat if the gross sales did not attain a certain minimum. The question as to who should pay the water charges was not then determined. Other matters later discussed by the attorneys in connection with the draft lease show that many material terms had not been settled on April 20. At that date it would seem that the parties agreed on certain fundamental terms of the proposed lease, with an implied understanding that others were to be settled later by mutual agreement. An agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto. *Ridgway* v. *Wharton*, 6 H. L. Cas. 238, 305. *Lyman* v. *Robinson*, 14 Allen, 242, 254. The transactions between the parties up to April 20 manifestly had reached the stage of "imperfect negotiation" and not of a completed contract. *Kaufman* v. *Lennox*, 265 Mass. 487, 489. The statement of Ratshesky that the "deal was closed," and his reply to Mr. Berger's words "There is nothing else": "That is all right. That is all settled," and similar statements have been held not to bar a defendant from asserting that he had made no completed

agreement. *Woods* v. *Matthews*, 224 Mass. 577, 583. *Kaufman* v. *Lennox*, 265 Mass. 487, 488. *C. F. Noyes National Realty Corp.* v. *Kinnell Realty Corp.* 277 Mass. 175, 179.

A second answer to the plaintiffs' contention is that, in the light of all the circumstances, the parties were not bound by a contract on April 20 for lack of an intention to be bound except upon the execution of a formal written instrument. It is to be remembered in this connection that Ratshesky on April 20 specifically refused to enter into a "short form of agreement" but insisted on having a lease drawn, to which the plaintiffs acquiesced. This fact is significant in showing that the parties did not intend to be bound until the perfected lease was executed. The circumstances indicate that the parties understood on April 20 that the bargain in part made was to be ineffective until there were further agreements. Williston, Contracts, § 37. There is nothing in the record which discloses that at any time after April 20 and before the withdrawal of the defendants from the negotiations any writing in final form had been executed by the parties. Two draft leases had been discussed by attorneys for the parties but the terms were still being changed and added to when the negotiations were broken off by the defendants. It follows that the defendants at the time they withdrew were not prohibited by any contract from so doing and that their refusal to go forward with the negotiations entailed no legal liability on their part.

The plaintiffs contend that there was sufficient evidence presented at the trial to warrant the submission of the case to the jury. This contention rests upon the assumption that the evidence warranted a finding that the parties came to a final agreement on April 20 and that that is established and concluded by the memorandum of agreed items kept by Mr. Berger and the other memorandum signed by Ratshesky on that date. Making every assumption in favor of the plaintiffs of which the evidence is fairly susceptible, this contention cannot be sustained. It presented an issue of law and not of fact. *Ellis* v. *Block*, 187 Mass. 408, 411. *Bresky* v. *Rosenberg*, 256 Mass. 66, 75.

If the contract was not finally complete on April 20, but was to be binding upon the execution of the lease, it is plain that the memorandum signed on April 20, before a final agreement was reached, could not be used to meet the requirement of the statute of frauds as to Ratshesky or the other defendants. G. L. (Ter. Ed.) c. 259, § 1; c. 183, § 3. It is not disputed ·that the negotiations continued after April 20, and until May 1, just prior to the termination of all negotiations by the defendants. There is no evidence that these subsequent negotiations were evidenced by a writing, much less that it was signed by the defendants or by anyone thereunto duly authorized. The memorandum relied on, even if unimpeachable in form and substance to meet the requirements of G. L. (Ter. Ed.) c. 259, § 1, was nevertheless ineffective, because it was not "posterior in point of time to the contract of which it is" alleged to be the record. *Williams* v. *Bacon,* 2 Gray, 387, 391. *Wiessner* v. *Ayer,* 176 Mass. 425. *Munday* v. *Asprey,* 13 Ch. D. 855.

It becomes unnecessary to discuss the other questions argued by the plaintiffs. The direction of the verdicts for the defendants was right.

*Exceptions overruled.*