Dunlop and others, Appellants, v. Laitsch and another, Respondents.*

*February 5—March 6, 1962.*

* Motion for rehearing denied, without costs, on May 1, 1962.

For the appellants there was a brief and oral argument by *Louis C. Ritter* and *Joseph N. Misany,* both of Milwaukee.

For the respondents there was a brief and oral argument by *Clayton A. Cramer* of Waukesha.

BROWN, J. Appellants are members of the Dunlop family. They will be referred to herein as "Dunlop." Respondents are members of the Laitsch family and they will be referred to herein as "Laitsch."

Dunlop and Laitsch owned adjoining real estate. A portion of their respective lands is low and swampy. The swamp is drained by a small stream. The two parties determined to improve their properties by damming the stream, impounding the water, and converting the swamp into a lake. To accomplish this purpose the parties entered into a written agreement, or agreements, which are the subject of this litigation. On July 5, 1956, they signed what we will call Agreement "A," and at the same time they signed what they refer to as an "Additional Agreement," and which we will call Agreement "B." The material parts of Agreement "A" read:

"Whereas all parties herein concerned mutually desire and agree to construct a body of water in the form of a lake on the above-described real estate, which lake would be located on said real estate, affecting the rights of all parties herein concerned and which lake would be advantageous to all parties herein concerned, enhancing the value of their respective property;

"Therefore, for the purpose of forming this lake, all parties herein concerned mutually agree to share equally the cost of constructing and maintaining a dam which will be necessary to convert present swamplands on the above-described real estate into a suitable lake; that the cost of constructing and maintaining said dam shall be shared as follows: Parties of the first part shall pay half of said cost and parties of the second part shall pay the other half of said cost;

"That the water level of the lake shall remain constant, according to the mutual agreement of all parties herein concerned, and that once a constant water level is arrived at by mutual agreement of all parties herein concerned, said water level shall not be altered in any manner whatsoever or by any person or persons whomsoever, except by mutual agreement and consent of all parties herein concerned;

"That all the provisions of this instrument shall extend to and apply to all parties of the first part and of the second part, and to the heirs, executors, administrators, legal representatives, successors, and assigns of the respective parties, and

shall remain effective for twenty-five years from date hereof."

Agreement "B" was then executed on the same day. Its material parts are:

"It is further mutually agreed between [Laitsch and Dunlop], that they and each of them shall at a future date mutually agree and come to a common understanding as to the use of their respective lands surrounding the lake which shall be formed on their lands and as to the type and structure of any buildings which shall be erected on their respective lands surrounding said lake.
"It is further agreed that this additional agreement is made by the parties herein named for and in consideration of the mutual considerations previously expressed in agreement attached [Agreement "A"] hereto and executed together with said agreement, it being the desire and understanding of all parties herein named that the agreement hereto attached and this additional agreement shall be considered as all one and the same agreement."

After the agreements had been signed the parties consulted several contractors about the contemplated dam and what it would cost and they accepted a contractor Mann's recommendations concerning the height of the dam, its design, location, and the materials used in its construction. Mann offered to build the dam such as he described for $1,800 and they employed him to build it. Thus, in the autumn of 1956 a clay dam was built with a concrete spillway. Each party paid half the original contract cost and half of the cost of some repairs required the following spring. The water reached the spillway level in April, 1957, but the level so attained did not inundate Laitsch's swamplands to the extent he expected or desired and Laitsch demanded that the dam be built higher, Dunlop refused to agree and the dam stayed at the height originally built. In the spring of 1958 other repairs were necessary. These were made by a different contractor engaged by Laitsch.

In the spring of 1959 the dam washed out and Laitsch hired a new contractor to repair it. In the spring of 1960 the dam was again washed out and Laitsch again hired another contractor to make repairs and to increase the height of the dam sufficiently to raise the lake level approximately three feet which Laitsch considered would be sufficient to cover some of Laitsch's exposed lowland. The estimated cost of the repaired and enlarged dam is approximately $11,600.

Dunlop brought this action against Laitsch to recover one half the value of clay taken from his land in the construction of the original dam and for damages to Dunlop's property caused by the activities of the contractors employed by Laitsch subsequent to the spring of 1957. Dunlop alleges that his damages amount to $10,266.

In the alternative Dunlop alleges that it is impossible for the parties to come to any terms or agreement as contemplated by Agreements "A" and "B" and demands judgment declaring both such agreements are null and void and the parties shall be put in their original positions. Laitsch answered and counterclaimed demanding that Dunlop be compelled to share the cost of the enlarged dam and be restrained from interfering with the construction and maintenance of it or of the use of the lake.

The judgment dismissed Dunlop's cause of action for damages; adjudged Agreement "A" to be valid and Agreement "B" to be invalid; authorized the construction of a dam according to certain specifications to raise the water level three feet; required Dunlop to pay one half the cost of repairs made in the years from 1958 through 1960, and one half the cost of the construction and future repair and maintenance of the new dam; and restrained both parties from interfering with such work on the dam or with the enjoyment of the lake by the respective parties. Other provisions of the judgment direct the manner in which the

respective parties may enforce, or be compelled to obey, the terms of the judgment.

The trial court found:

"8. That at the time of the execution of said agreement between plaintiffs and defendants, and subsequent thereto, it was understood and agreed between the parties that the height of the dam or dams to be constructed, type of construction, and the materials to be used in connection with such construction was to be left entirely to the judgment and discretion of the contractor to be employed by the parties for such construction since neither party had any knowledge or experience in connection with the construction of a dam or the height required to create the lake contemplated by the parties; that the plaintiffs and defendants mutually agreed to the employment of Mann Brothers, contractors of Elkhorn, Wisconsin, to construct said dam or dams necessary to create the lake contemplated by the parties; that plaintiffs and defendants mutually agreed to the location of the dam to be constructed, which was on plaintiffs' premises, and so advised the contractor. The contractor was shown the area by the parties which was to be inundated by the creation of the lake proposed, and such area so shown to the contractor included the area indicated on defendants' Exhibit 11 colored in pink and designated as 'old marsh area' and consisting of 4.2 acres; that the contractor had full knowledge of the area to be included in the lake prior to the time that work was to be started on the construction of the dam."

And found also:

"12. That the dam is in need of permanent repair and improvement at the present time in order to prevent the same from washing out and thereby destroying the lake created by its construction; that additional construction thereon is required in order to raise the height of the dam to provide for the additional water required in the lake in order to inundate all of defendants' lands as contemplated by the parties at the time of the execution of the agreement dated July 5, 1956, and the construction of the dam."

We must agree with the trial court that it was the purpose of the parties to create a lake which would inundate certain marshy portions of the land of each party. The size and character of the dam were only a means to that end. The original dam in which the parties co-operated was never mutually accepted by the parties to be an ultimate dam regardless of how much water it might impound, nor was the water actually impounded by that dam a level set by mutual agreement, as contemplated by Agreement "A." Dunlop was satisfied with depth of water over his property as soon as the spillway began to function, but Laitsch protested at once and continuously.

The trial court was clearly right in declaring Agreement "B" to be unenforceable, null and void. It is simply an agreement to agree at a future time of the use of their lands. The authorities cited by Laitsch are conclusive on that point. They are:

"An agreement that they [the parties] will in the future make such contract as they may then agree upon amounts to nothing." 12 Am. Jur., Contracts, p. 521, sec. 24.

"An agreement to reach an agreement . . . imposes no obligation on the parties thereto." *Rosenfield v. United States Trust Co.* (1935), 290 Mass. 210, 217, 195 N. E. 323.

"At best it [the document in question] is nothing more than an agreement to make a future agreement as to an essential term, which cannot be supplied by implication of law. Under the circumstances, because there has been no meeting of the minds as to an essential term, there can be no recovery. [Cases cited.]" *Machesky v. Milwaukee* (1934), 214 Wis. 411, 413, 253 N. W. 169, cited with approval in *Kelley v. Ellis* (1956), 272 Wis. 333, 336, 75 N. W. (2d) 569, 76 N. W. (2d) 540.

The learned trial court ignores any effect which Agreement "B" has on the controversy other than to dismiss it from consideration as being unenforceable and void. In that

we think the court was wrong. By the very terms of Agreement "B" it and Agreement "A" constitute one agreement. Dunlop's evidence, summarized, is:

"Mr. Laitsch's attorney at the request of Mr. Laitsch drafted the agreements. When I had first seen the agreement I did not accept it because I regarded it as being incomplete or inadequate because it made no reference to the use of the lands in the lake area. I discussed this matter with Mr. Laitsch and told him I couldn't accept the agreement as it was because it would leave an opportunity for behavior on the part of either of us in the form of land use that might be objectionable, and I thought there ought to be some safeguards as to the use of the land."

Dunlop goes on to tell what restrictions and conditions of land use he had in mind. Laitsch testified, summarized:

"We both agreed that there should be a supplemental agreement as to use of our respective lands surrounding the lake. Such use of our respective lands was to be according to the agreement mutually agreeable, that we were to mutually agree upon. We decided not to have any small homes on there. They should be year-around homes and type of construction that would be decided at a later date. I don't think there was anything said as to arbitration if the agreements were violated. In the event of a violation we thought it would be settled when we had a meeting to decide that. Actually we did have a meeting when the agreements were signed but at a future date we were going to discuss the land and its uses. No future date was fixed."

It is self-evident that in the expensive creation of a lake to enhance the value of the land of the riparian owners a substantial factor in the purpose of doing so may be the use of the adjacent land. If the contracting parties recognize the importance to them of an agreement upon the use of the land we are not justified in saying that the impossibility of compelling the parties to agree renders an agreement about the land unimportant. A belief in a provision to agree to the use of the land, although it turns out

to be void, is, nevertheless, a substantial inducement to acceptance of the other obligations of the contract.

We conclude that the failure to provide an enforceable mutual agreement on the use of land results in an absence of a meeting of the minds as to an essential term. *Machesky v. Milwaukee, supra.*

Dunlop testified that he would not have signed Agreement "A" without Agreement "B" and Laitsch testified that the building sites would be used for homes of a certain character. If the parties, particularly Dunlop, had not relied on Laitsch's agreement to agree (Agreement "B") there would have been no Agreement "A" and no dam. We think that the failure to agree goes to the heart of Agreement "A" and when Agreement "B" falls because unenforceable and void, "A" goes with it because of the absence of a meeting of the minds as to an essential term.

Accordingly, we hold that there is no valid separable Agreement "A" obligation whereby Laitsch can compel Dunlop to defray one half the cost, repair, maintenance, or improvement of the dam. Neither has Dunlop any contract rights against Laitsch. We leave the parties as they were at the last moment when they were in agreement, that is when dam builder, Mann, had completed his original construction and repairs in the spring of 1957.

*By the Court.*—Judgment reversed. Cause remanded with directions to dismiss the complaint and the counterclaim.

The following opinion was filed May 1, 1962:

PER CURIAM (*on motion for rehearing*). The respondents have argued in their brief the decision and mandate of this court leave the essential controversy unresolved. This is due to the fact the case was tried and appealed on the contract theory rejected by this court. The respondents desire to

retry the case on new theories of irrevocable license in the nature of equitable easement, estoppel, and other principles. This, they cannot do. However, in our opinion we stated:

"We leave the parties as they were at the last moment when they were in agreement, that is when dam builder, Mann, had completed his original construction and repairs in the spring of 1957."

Preceding this quotation, we stated Laitsch and Dunlop had no contractual rights against each other. This statement must be read in connection with increasing the height of the dam. We recognize the parties had rights in the *status quo* with respect to the maintenance and repair of the dam resulting at that time from the voluntary execution of the void agreement. Respondents ask us to decide what those rights are. Considering the arguments to be new matter, which they are in effect, the appellants' brief does not answer them. We believe it advisable to remand the case for a determination of the rights of the parties to and resulting from the dam as it existed in the spring of 1957 but such determination is limited to those rights and does not include the increasing of the height of the dam or the area of the flowage over that of the spring of 1957. If necessary, the trial court should grant leave to amend the pleadings. The mandate is modified to read: Judgment reversed, with directions for further proceedings consistent with the opinion and this memorandum. Rehearing denied, without costs.