# United States Court of Appeals
## For the First Circuit

No. 03-1172

JAMES G. BOYLE and
TUCK'S TRUCKS, INC.,

Plaintiffs, Appellants,

v.

INTERNATIONAL TRUCK AND ENGINE CORPORATION,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Torruella, Circuit Judge,
Cyr, Senior Circuit Judge,
and Lipez, Circuit Judge.

John J. Kuzinevich, for appellants.
Matthew A. Porter, with whom Timothy C. Blank and Dechert LLP,
were on brief, for appellee.

May 21, 2004

**TORRUELLA**, **Circuit Judge**. This case involves a dispute between a manufacturer of trucks and a man who would like to sell and service those trucks. The former chose to discontinue a working relationship that developed between the two, and the latter sued for damages and injunctive relief. The district court granted defendant-appellee International Truck and Engine Corporation ("Navistar") summary judgment, and plaintiff-appellant James G. Boyle's appeal brings the dispute before us. After careful review, we affirm.

## I. Factual Background

In April 1997, Boyle contracted with Thomas Walsh through a Purchase and Sale Agreement ("P&S") to acquire Walsh's truck dealership, Tuck's Trucks Sales ("Tuck's"), located in Hudson, Massachusetts. Tuck's dealt and serviced GMC and Navistar vehicles.

The Navistar franchise that Boyle hoped to acquire was not in great shape. In February, prior to signing the P&S, Walsh received a letter from Navistar advising him of deficiencies at the site and proposing termination of the franchise due to low business volume. Boyle helped Walsh respond to that letter, and Navistar decided not to terminate the dealership at that time. In fact, shortly after signing the P&S, Walsh had to leave Massachusetts for personal reasons, and Boyle took over management duties and sold eight Navistar trucks over the summer.

According to Tuck's contracts with GMC and Navistar, the dealership contracts were not assignable. Instead, Boyle could purchase Tuck's assets, excluding the dealerships, and reach agreements with those manufacturers directly to secure the value of the assets. The P&S specified as a purchase contingency Boyle's success in reaching dealership agreements with both GMC and Navistar.

The GMC dealership, representing over 80% of Tuck's business, was the prize Boyle had to win. If he could not secure a dealership contract with GMC, Boyle made clear all along, he could not go ahead with the purchase. In contrast, Boyle did not secure -- or even apply for -- the Navistar dealership before closing the deal with Walsh, figuring that GMC's answer one way or the other controlled his intentions to purchase Tuck's.

Navistar wrote Walsh on May 5, 1997, to remind him that the dealership was not assignable and to specify what Boyle should submit as an application. According to that letter a complete application would include: (1) a statement of Boyle's relevant background; (2) a Letter of Intent indicating how Boyle planned to be successful in that market; and (3) personal financial information (relevant to financing).

Before the deal closed, Walsh wrote Boyle on October 1, 1997, to explain that Boyle would have to waive the condition on the P&S regarding the Navistar dealership, and offered to retain

the dealership at that site, after the assets had transferred, under Walsh's own auspices, "until such time as Navistar makes its decision [regarding Boyle's dealership] but in no event later than October 31, 1997." Thus, Boyle could continue to manage Walsh's dealership even after he owned the site.

Later in October 1997, Boyle got the long-awaited GMC approval, and the purchase of assets from Tuck's went through. When Walsh and Boyle closed the deal, there was no agreement between Boyle and Navistar, so Boyle had to waive the contingency in the P&S permitting him to back out of the deal if he had not gotten Navistar's approval to become the dealer. Nevertheless, Boyle continued doing warranty work and made a few sales for Navistar in the following months; Boyle does not claim that Navistar failed to compensate him for this work.

On October 31, 1997, Navistar sent Walsh a letter indicating that Boyle had never applied for the dealership, despite having twice stated an intention to do so, and terminating Walsh's franchise effective December 31, 1997.

On November 4, 1997, Boyle submitted a photocopy of his GMC application to James Williams, Navistar's Manager of Dealer Operations. On November 24, 1997, Williams wrote Boyle to tell him that Navistar had concluded that the market could not support the dealership and suggested that he might become an associate dealer through a full dealer located in nearby Bedford, Massachusetts.

-4-

Both before and after the closing, Boyle spoke with several people at Navistar about his dealership prospects. The Navistar New England Sales Manager, Mark Nicholas, expressed to Boyle a hope that they could reach a deal. Wayne Krzysiak, the Vice President of Dealer Operations, told Boyle that, in light of his approval by GMC, he could not see any reason why Boyle wouldn't be able to continue dealing for Navistar. Tom Grogan, Nicholas's boss and a regional Vice President, thought the approval would be a formality, a matter of getting all the paperwork done. Bob Mann, the national sales manager, told Boyle that he liked Boyle's leasing background and that he was sure "we'll get this all worked out." Boyle admitted in a deposition that he knew that none of these people had the authority to grant him the dealership and that he had no reason to believe they were lying in their comments to him.

Boyle's communications with James Williams revealed a factor working against his prospects. Williams expressed concern about granting the dealership because some Ford dealers in Pennsylvania were suing the factory alleging that Ford put them in a position in which they could never make money. As Boyle understood it, Williams was worried that Boyle wouldn't be able to run a profitable Navistar dealership at the site. Williams expressed hope they could find a solution, and Boyle offered to release Navistar from any possible suit.

After taking over from Walsh, Boyle continued to perform warranty work for Navistar and to sell Navistar vehicles for another four months. Even after Navistar terminated Boyle as a "Ship to Address," permitting direct shipments of parts, Boyle continued servicing his Navistar clients by buying parts from an authorized dealer and performing the service work.

## II.  **Analysis**

Boyle believes Navistar's decision to cease dealings with him was wrongful and claims an entitlement to damages and/or injunctive relief based on five theories. In essence, Boyle wants access to the legal remedies that would be available to a dealer whose relationship with the manufacturer is unilaterally terminated. Because there was never a written contract between the parties providing for Boyle's dealership of Navistar's trucks, Boyle's claim requires him to argue that (1) an oral dealership contract existed; or (2) an implied in fact dealership contract existed. In the alternative, Boyle makes claims based on Mass. Gen. Laws ch. 93A & 93B charging that Navistar's termination of the relation with Boyle amounted to a prohibited business activity. Finally, Boyle argues that he detrimentally relied on statements made to him by Navistar's representatives that the application process was a mere formality.

## A. Oral Contract and Contract Implied in Fact

"It is a settled principle of contract law that a promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract." R. I. Hosp. Trust Nat'l Bank v. Varadian, 647 N.E.2d 1174, 1179 (Mass. 1995) (quoting Schwanbeck v. Federal-Mogul Corp., 592 N.E.2d 1289, 1292 (Mass. 1992) (internal citations and quotations omitted)). The comments that Boyle alludes to in support of the formation of an oral contract -- comments by Navistar employees that he was or would be the dealer -- pale next to the unequivocal and written communications from Navistar that Boyle had to complete a multi-part dealership application before Navistar would approve him and are also undermined by his own admissions during his deposition that, as far as he knew, none of the employees making the alleged statements had the authority to unilaterally grant the -- as yet ungranted -- dealership to him.

Boyle may have alleged a triable question of fact regarding Navistar's present intentions to offer him the dealership during the summer and fall of 2000, based on verbal communications, but such an intention -- even if proven -- does not suffice to establish that there was an oral contract. Id. Boyle's argument for oral contract formation also depends on a proposition that we cannot accept: that none of the terms of the dealership contract would require negotiation. See Rosenfield v. U.S. Trust Co., 195

N.E. 323, 325 (Mass. 1935) ("A failure of the parties to agree on material terms may not merely be evidence of the intent of the parties to be bound only in the future, but may prevent any rights or obligations from arising on either side for lack of a completed contract.") (citations omitted). Boyle undercuts this point by recognizing in his deposition that neither the performance requirements nor the geographic area of the dealership had been negotiated and set. Furthermore, the claim is inherently implausible, as manufacturers and dealers frequently adjust standardized contracts to suit their needs. See, e.g., Coady Corp. v. Toyota Motor Distrib.,Inc., 361 F.3d 50, 61-62 (1st Cir. 2004) (discussing that Toyota granted a car dealer with a six-year contract only a two-year contract extension and required "a non-standard provision requiring [the dealer] to maintain 100 percent or better 'retail sales efficiency'").

Boyle claims, though, that even without an oral contract, his dealings with Navistar produced a contract implied in fact. See LiDonni, Inc. v. Hart, 246 N.E.2d 446, 449( Mass. 1969) ("In the absence of an express agreement, a contract implied in fact may be found to exist from the conduct and relations of the parties."). Boyle admits that Navistar compensated him in full for all sales and services performed for its benefit until the time when their relationship was dissolved. If there was a contract implied in fact, it consisted of a promise of payment for these services

rendered.  Moreover, an implied in fact dealership claim cannot reasonably be inferred after Navistar expressly rejected Boyle's dealership application.  The fact that for several months after officially denying Boyle the dealership Navistar engaged him in many of the same business activities that it had with its official dealers did not impose upon Navistar the further obligation to deal with Boyle like a dealer under contract.

### B.  **Chapters 93A and 93B**

Boyle appeals to provisions in Chapters 93A and 93B to redress his loss of Navistar business.  Chapter 93B, which generally prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices" between motor vehicle manufacturers, distributors and dealers, Mass. Gen. Laws ch. 93B, § 3, "protect[s] motor vehicle franchisees and dealers from the type of injury to which they had been susceptible by virtue of the inequality of their bargaining power and that of their affiliated manufacturers and distributors."  Beard Motors, Inc. v. Toyota Motor Distrib., Inc., 480 N.E.2d 303, 306 (Mass. 1985).  As such, only dealers, and not prospective dealers, have standing to sue under Chapter 93B. Id.  Boyle argues that the contractual relationship -- payments for services rendered -- that existed between him and Navistar suffices for Chapter 93B standing.

Boyle's continued work with Navistar arguably makes him more than a prospective dealer in a way that is relevant to his

Chapter 93B standing.[1]   Up until the end of 1997, Boyle's "dealership" work for Navistar was done under the auspices of Walsh's dealership contract.  Boyle acknowledged this by waiving the condition to the P&S permitting him to walk away from the deal if he did not have an agreement with Navistar.  The Massachusetts Appeals Court has commented that it does "not think that the principle established in the Beard case can be circumvented by the tail chasing expedient of assigning the existing dealer's rights to the aspiring dealer."  Greater Lowell Auto Mall, Inc. v. Toyota Motor Distrib., Inc., 618 N.E.2d 1369, 1371 (Mass. App. Ct. 1993). We agree and conclude that Boyle did not gain Chapter 93B standing by virtue of working for Navistar under Walsh's dealership contract.

Boyle, though, continued to perform warranty work for Navistar into the spring of 1998, after Walsh's dealership was terminated on December 31, 1997.  We believe that Beard also precludes the standing of a prospective dealer whose dealership application has been formally rejected -- as Boyle's was on November 24, 1997 -- even where that prospective dealer continues

---

[1]  Under the 2002 amendments to Chapter 93B, which do not apply retroactively, the lack of a written dealership agreement would explicitly preclude Boyle's claim.  See Mass. Gen. Laws ch. 93B, § 1 (limiting "dealers" to persons who have obtained "a class 1 license pursuant to the provisions of section 58 and 59 of chapter 140"); Mass. Gen. Laws ch. 140, § 58(b) (authorizing only persons "whose authority to sell [motor vehicles] is created by a written contract with such manufacturer" to obtain an agent or seller's license).

to perform warranty work for the manufacturer.  See Beard, 480 N.E.2d at 306-07 ("The injuries alleged by Beard -- primarily the loss of anticipated profits from the sale of Toyotas and from capital appreciation in the value of the Toyota dealership, due to its inability to obtain the Toyota franchise -- are not injuries within the area of legislative concern that resulted in the enactment of [Chapter 93B].").

The Chapter 93A claim involves the related allegation that Navistar was unfair and deceptive in how it handled and ultimately denied Boyle's dealership application.  Navistar offered as its explanation for the rejection the limited market potential of the dealership, as shown by difficulties experienced by Walsh at the location, combined with Boyle's failure to provide financial projections with his application.  Boyle alleges that Navistar representatives told him that the problem with his application was his decision merely to submit a photocopy of his GMC application instead of providing the application materials specifically requested by Navistar.  From this he concludes that Navistar's official reasons were a pretext, and thereby surmises the unfair and deceptive conduct, or as put in the brief: "Navistar's 'tricking' Mr. Boyle into performing services for it while leading him on as to his status as a dealer constitutes an unfair or deceptive act."  This "leading on," Boyle argues, had as the "net

-11-

effect" his "thinking he was a dealer so that Navistar could ease the termination of Mr. Walsh's dealership."

"[A] chapter 93A claimant must show that the defendant's actions fell 'within at least the penumbra of some common-law, statutory, or other established concept of unfairness,' or were 'immoral, unethical, oppressive or unscrupulous,' and resulted in 'substantial injury . . . to competitors or other business[persons].'" Quaker State Oil Ref. Corp. v. Garrity Oil Co., 884 F.2d 1510, 1513 (1st Cir. 1989) (quoting PMP Assocs., Inc. v. Globe Newspaper Co., 321 N.E.2d 915, 917 (Mass. 1975)). Navistar offered legitimate business reasons for failing to enter into a highly regulated business arrangement. See Greater Lowell Auto Mall, 618 N.E.2d at 1372 (discussing several "relevant considerations" including "the location of the proposed dealer"; "whether the proposed dealer has a history of profitable operation"; and "whether the proposed dealer has provided the manufacturer with solid information about its qualifications"). Navistar's longstanding -- and expressed -- concern with the potential market at the site endured after Boyle's application, as Boyle failed to comply with the requirement of submitting a Letter of Intent demonstrating how he planned to be successful selling Navistar trucks at Tuck's, in a way Walsh had not been. The effects of Navistar's actions, e.g., leading Boyle to think he was a dealer, are not actionable under Chapter 93A. Boyle has not

-12-

stated a claim as to Navistar's unfairness or lack of scruples that triggers the protections of Chapter 93A.

### C. **Detrimental Reliance upon Misrepresentation**

Since "the evidence in this case did not warrant a finding that a 'promise' in the contractual sense had been made . . . no amount of reliance on the part of [Boyle] would give rise to a 'contract' by virtue of reliance." R.I. Trust Nat'l Bank, 647 N.E.2d at 1179. Nevertheless, Boyle argues that representations made by Navistar that the application process was a mere formality led to his failure to properly apply for the dealership. "In order to establish such a claim, [Boyle], at a minimum, must establish that [Navistar] made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that [Boyle] reasonably relied upon the representation as true and acted upon it to his damage." Russell v. Cooley Dickinson Hosp., Inc., 772 N.E.2d 1054, 1066 (Mass. 2002) (internal citations and quotations omitted).

Boyle's claim fails because he could not reasonably rely on these representations because he knew, as he admitted in his deposition, that none of the individuals making these representations had the authority to grant or deny him the dealership. An official Navistar communication indicated to Boyle that he should submit several items, and by a particular date, in order to be considered for a dealership. It was unreasonable for

-13-

Boyle to disregard these instructions by relying upon statements made by Navistar employees who lacked the authority to decide whether Boyle would become a Navistar dealer.

### III. <u>Conclusion</u>

Boyle understandably recoils from the loss of a business opportunity that he hoped would be part of Tuck's Trucks going forward. The Purchase and Sale Agreement permitted Boyle to opt out if he was not able to secure the Navistar dealership. Boyle waived that condition, and in doing so, exposed himself to the possibility of running a dealership without Navistar. The work Boyle did for Navistar does not alter this result.

The district court correctly granted Navistar's motion for summary judgment.

**<u>Affirmed with costs to appellees</u>**.