In re HARVEY PROBBER, INC., a/k/a Harvey Probber, Inc., Debtor.

HARVEY PROBBER, INC., a/k/a Harvey Probber, Inc. (Massachusetts), Plaintiff,

v.

VOKO FRANZ VOGT & CO. and Fixture Furniture, Defendants.

Bankruptcy No. 84–166–HL.

Adv. No. 84–323.

United States Bankruptcy Court, D. Massachusetts.

June 25, 1985.

William F. Macauley, Christopher W. Parker, Stephen W. Wald, Craig & Macauley Professional Corp., Boston, Mass., for plaintiff/debtor.

Bruce W. Edmands, Mahoney, Hawkes & Goldings, Boston, Mass., Lawrence A. Mandelker, Baskin & Steingut, P.C., New York City, for defendant/VOKO Franz Vogt & Co.

### FINDINGS AND RULINGS RE PROBBER/VOKO AGREEMENT [1]

HAROLD LAVIEN, Bankruptcy Judge.

This dispute is based on an alleged exclusive agreement to distribute the VOKO

1. The parties filed a stipulation consenting to the referral of this non-core adversary for hear-

products in the entire North American Continent and the Caribbean[2] based on a one-page non-lawyer-drawn agreement of October 31, 1982.[3] The dispute has occasioned discovery in this country and Germany, trial, extensive briefing, and the Court is left with the confusion experienced by an ocean sailor who faces the shifting winds of inland lakes. The ambiguity of the original document, entitled "agreement," dated October 31, 1982 is more than matched by the conduct of the parties from which support can be culled for each party's position; but viewed as a whole case, I can reach only one reasonable conclusion, namely, that the parties desired to do business on a basis to be mutually advantageous but never quite achieved a full meeting of the minds.

The evidence and contentions of the parties and my findings and rulings are as follows:

Both Harvey Probber, Inc., a/k/a Harvey Probber, Inc. (Massachusetts) ("Probber") and VOKO Franz Vogt & Co. ("VOKO") are duly organized corporations under the laws of Massachusetts and Germany, respectively, and are both manufacturers and distributors of office furniture, the former in the United States, the latter in Germany and 27 other countries in Europe, the Middle East and Asia. In September, 1982, Mr. Harvey Probber, the president and principal officer of Probber, first became seriously interested in VOKO's products—office furniture and systems—that were designed uniquely to provide flexibility in utilization of office space. On a visit to a trade show in Milan, Italy, Mr. Probber contacted VOKO by telex requesting catalogs be delivered to his hotel in Milan. VOKO responded by informing Mr. Probber that they were having an exhibit at the Milan fair and that they would welcome a visit by Mr. Probber.

Accordingly, Mr. Probber visited the VOKO exhibit as his first order of business upon arriving at the Milan trade show. He met with two representatives who informed Mr. Probber that Franz Vogt ("Vogt"), owner of VOKO, would be attending the fair. An appointment was arranged.

Mr. Probber met Vogt at the exhibit. Mr. Probber described his company as a small concern with approximately eight to nine million dollars in annual sales. He represented that his company manufactured its own furniture and provided Vogt with a catalog which impressed Vogt who,

ing, determination, and entrance of a final order pursuant to 28 U.S.C. § 157(c)(2). If, because the stipulation was filed with this Court rather than the District Court as implied by 28 U.S.C. § 157(c)(2), it should be determined that this Court could not render a final judgment, in that event, the Court submits its Findings and Rulings as proposed Findings and Rulings.

2. A conflict of law question would seem to be raised. The agreement was executed in Germany contemplating Probber's performance in the United States. Both the standard Partnership (Dealer) Contract and the License and Know-How Contract provide for German law; however, the parties agreed when the Court raised the issue that Massachusetts law would control and have argued and briefed the cause and on that basis, Court will, therefore, rule that Mass. law controls and, in any event, since no evidence to the contrary was presented that German law, if appropriate, is consistent with Mass. law.

3. AGREEMENT
VOKO Franz Vogt and Company, a furniture manufacturer in West Germany and Harvey Probber, Inc., a furniture company in the U.S.A., have had meetings and discussions and have together agreed that Probber will represent, market and sell VOKO products in the U.S.A., Canada and Carribean Islands.
Probber will import products and components from VOKO and/or manufacture the VOKO system of wall units and partitions as will be beneficial and agreeable to both companies.
To encourage and accelerate Probbers planning and marketing activities, VOKO and Probber also agree to negotiate a more detailed contract at their earliest mutual convenience. The terms and conditions of this contract will be in general accordance with VOKO's standard Partnership (Dealer) Contract and the License and Know-How Contract.
The agreement is concluded for an indefinite period. It becomes effective when signed and when all permits necessary towards its performance have been granted. The agreement may first be terminated on 31st Dec. 1985 by serving notice of 1 year. After this time, it can be terminated by serving notice of 1 year before the end of three calendar year extension periods.
Cologne, October 31, 1982

then, invited Probber to visit the VOKO factory in Polheim, Germany.

Mr. Probber changed his plans to return to the United States and visited the VOKO factory. There, he met with Ernst Breer ("Breer") the American equivalent of a chief operating officer and second in command to Vogt. They discussed the manufacture of VOKO products at Probber facilities, marketing and distribution, communications, sales and discounts, design and engineering, among other items. No agreement was reached although the parties agreed to meet at Orgatecknik—a German furniture show which was to take place in late October, 1982. Additionally, VOKO provided Mr. Probber with a "Dealer Contract" (Exhibit 2) as representative of VOKO's contracts with its dealers. Probber had this translated from the original German to English upon his return to the United States.

At Orgatecknik, Mr. Probber met with Hans Heller and Werner Lotz, respectively, the export manager and sales executive for VOKO. Serious discussions and negotiations commenced. During these negotiations, a "License and Know How" contract was produced by VOKO and provided to Mr. Probber as an alleged example, as the name implies, of the type of agreement with one who was to be licensed to manufacture and then distribute. At one point, the VOKO representatives requested that Mr. Probber draft an "interim" agreement that could serve as the basis of further cooperation. Mr. Probber hand wrote a draft that night; the draft was discussed and redrafted at least twice the following day. The final draft was signed by the various parties. *See* Footnote 1. Curiously, the agreement does not describe Probber as owning the "sole" or "exclusive" rights to license, distribute and exhibit VOKO production in the United States. This is most curious as earlier drafts, admittedly, did contain such language. Regarding this deletion, Mr. Probber, originally, offered no explanation but, later, when questioned about the deletion by the Court, Mr. Probber testified:

When this occurred, I protested vigorously at the deletion. And I was told—and one must look at this in context—I was told by Hans Heller, with whom I was working, that, "Look. It is late. This affair is closing. This is already contained in your licensing contract. I don't even think I can find somebody to retype this now. Look."

He did not explain why the term "exclusive" or "sole" was not penned in and initialed. Only Mr. Probber testified as to these events at Orgatecknik; Werner Lotz and Hans Heller did not testify.

Following the signing, and upon returning to the United States, Probber attempted to promote the VOKO line of products. It contacted customers, contacted Probber's national sales representatives, planned publicity campaigns, produced slide shows, and wrote "copy." VOKO conceded that Probber made considerable marketing efforts but Probber conceded that they were all unsuccessful to the extent that nothing substantial was sold and nothing was manufactured.

Almost immediately, VOKO acted as if no contract, at least an exclusive one, existed between the parties. On January 18, 1983, in response to the continual inquiries by Probber, VOKO finally answered and apologized, but it also noted the following:

We consider our agreement we signed in Cologne in mutual respect an esteem as the basic requirement regarding our interests in the United States. In order to ensure a long lasting success for both of us it is essential now to develop an adequate strategy to reach this aim. It seems important to us in this connection to find out the amount of investments necessary for the introduction, production and marketing of our products in the American market. These are all questions of far reaching consequences which should be carefully examined and weighed.

There followed a list of specific questions on the market and Probber's position in it, a request for a $60,000 deposit, and a concluding paragraph that emphasizes the de-

sirability for getting this information so that contracts can be prepared. When Probber was asked about this letter, he said he was puzzled because it was inconsistent with his concept of an already signed exclusive agreement. It is hard to accept that if these were questions mandating careful consideration after the signing of the October 31 agreement, how the October 31 agreement was envisioned, at least by VOKO, as an exclusive contract.

Further, only in April, 1983, did a representative of VOKO, Ernst Breer, visit the Probber facility in Fall River, a belated visit for a partner who had signed an exclusive contract. Further, in the course of this visit, Breer discussed other potential distributors in the United States. Probber complains of a general atmosphere of uncooperativeness—price lists were requested but often were not provided, or provided belatedly, communications went unanswered, and sale aids (samples and catalogs) provided belatedly with what Probber characterized as misinformation. Particularly, Probber faulted VOKO for the failure to obtain a major contract with Xerox:

UNFORTUNATELY, WE LOST THE 15 STATION XEROX JOB. WE FEEL THEIR DECISION WAS STRONGLY INFLUENCED BY THE FOLLOWING: 1) OUR QUOTATION WAS BASED ON HIGHER COSTS AS PER INFLATED PRICE LISTS WE HAD BEEN SENT AND WERE USING. 2) XEROX DEMANDED ACCURATE AIR FREIGHT RATES BEFORE WRITING A.P.O. WITH NO WEIGHT OR CUBAGE INFO HERE, WE TELEXED FOR RATES ON JANUARY 17TH. THE ANSWER CAME JANUARY 26TH—9 DAYS LATER. THIS TIME LAPSE CONCERNED THEM, PARTICULARLY IN DEALING WITH A NEW IMPORTED PRODUCT LINE ON FOR A RUSH ORDER. BOTH ABOVE FACTORS GAVE THEM CAUSE TO RECONSIDER.

However, there was no evidence from Xerox that Probber would otherwise have received the contract.

There was talk and negotiations of a joint venture and authorization for and the hiring of a general manager, but the Chapter 11 intervened and VOKO, fearful of Probber's financial condition, never signed the joint venture.

An "Interim Agreement" between VOKO and Probber was signed February 29, 1984. Probber argues that this contract evidenced the original intention of the parties in the October 31 agreement; VOKO contends that this agreement is simply irrelevant and was an attempt to bridge the increasing financial doubts by providing a trial period of performance. The bottom line is that VOKO desired to see some concrete performance and Probber was never able to produce any substantial sales activity.

The strongest evidence offered by Probber on the issue of exclusivity was VOKO's dealings with another American company, Kewaunee. Specifically, one telex sent by VOKO, in pertinent part, reads:

[A]fter detailed negotiations which have come to an end only yesterday we have to tell you that we ultimately decided to cooperate with probber in the [U.S.] market as our activities have already shown. [W]e have had connections with probber since september 1982 and we trust that you understand that we cannot and do not want to change our partner.

This telex illustrates the semantic difficulties in the use of terminology. The VOKO people use the term "partner" in a quite different context than we would use the term. Their dealers are all referred to as "partners," in the dealership contracts, though it is clear that their numerous dealers in Germany are not partners in the sense that we would use the term. I find that Probber draws too much from the Kewaunee telexes. VOKO had invested considerable time, effort and money in trying to develop Probber as a potential marketer of its product and was not yet willing to abandon that effort. This is borne out by another of the telexes indicating an attempt on a trial basis to give Probber one more last chance to perform well enough to

consider making them VOKO's primary distributor in the United States.

> [T]hank you for your telex 09 jan 84. [I] understand your situation with probber and that you gave them six months to meet certain goals. [I] can also see your concern about making an agreement for distribution of mepr until you have settled overall distribution.

The telex of January 9, 1984, however, was never produced by VOKO and, while Probber correctly seeks to have the Court draw adverse inferences from this failure, the most that can be made from that is that VOKO would recognize Probber as its exclusive U.S. distributor, if in six months it met certain goals. Something Probber failed to do.

Finally, it should be noted that despite the representation of dealing in 27 countries, and the production of at least 85 distributors outside of Germany, almost no contracts with these dealers were produced. It is almost inconceivable that a company with 80 million dollars in annual sales could conceivably expect this Court to believe that it did business on little more than a handshake.

Again, drawing such inferences from that, as would be most beneficial to Probber, the undisputed fact was that in each of those countries there were at least two distributors. Only in countries where the distributor was wholly owned was there any evidence of exclusivity, with the exception of one or two Arab countries.

The threshold inquiry facing the Court is whether the agreement between Harvey Probber, Inc. and Voko Franz Vogt and Co. dated October 31, 1982, constitutes a legally enforceable contract.

Accordingly, the Court, first, must examine whether there was consideration translated in this situation as a quest for mutuality of obligation.

■ On its face, the October 31, 1982 agreement seems to lack any obligation on Probber's part; however, both the U.C.C. and Mass. cases readily dispose of that issue by presuming an obligation to use best efforts, thereby making the consideration the exchange of obligations or promises by VOKO to supply the furniture, and by Probber to use its best efforts to sell the same. Mass.Gen.Laws Ann. ch. 106, (U.C.C.) § 2–306(2) (West 1958):

> (2) A lawful agreement by either the seller or the buyer for exclusive dealing in the kind of goods concerned imposes unless otherwise agreed an obligation by the seller to use best efforts to supply the goods and by the buyer to use best efforts to promote their sale. St.1957, c. 765, § 1, effective Oct. 1, 1958.

*See also Coan v. Holbrook*, 327 Mass. 221, 97 N.E.2d 649 (1951).

The more difficult question requires a mixed determination of law and fact and may be stated as follows:

> A. When the purported agreement contemplates a further written agreement which is, in fact, not executed, is there a legally enforceable agreement or merely an unenforceable agreement to agree? The resolution of that question seems to favor considering the original purported agreement preliminary negotiation unless the facts show an intention to be bound initially with the essential terms agreed upon with the further writing merely a formal memorializing of the existing agreement.

■ When the parties have not agreed to essential terms of the contract and intend to draw up a final written agreement in the future, the parties are generally considered to have reached the stage of "imperfect negotiation" and not a completed contract. For example, in *Rosenfield v. United States Trust Co.*, 290 Mass. 210, 195 N.E. 323, 122 A.L.R. 1210 (1935), the Court found that the parties had not intended to be bound until a final written expression of the draft lease was completed with agreement of terms such as construction of a new store front, and payment of heat and water was made. The Court said:

> ... [I]t would seem that the parties agreed on certain fundamental terms of the proposed lease, with an implied understanding that others were to be

settled later by mutual agreement. An agreement to reach an agreement is a contradiction in terms and imposes no obligation on the parties thereto.

*Rosenfield v. United States Trust Co.,* 290 Mass. at 217, 195 N.E. at 330. The Court presumed that the parties intended not to be bound by earlier negotiations:

> Normally the fact that the parties contemplate the execution of a final written agreement justifies a strong inference that the parties do not intend to be bound by earlier negotiations or agreements until the final terms are settled.

*Rosenfield v. United States Trust Co.,* 290 Mass. at 216, 195 N.E. at 329. *See also, Tull v. Mister Donut Development Corp.,* 7 Mass.App. 626, 630, 389 N.E.2d 447, 451 (1979). *Air Technology Corp. v. General Elec. Co.,* 347 Mass. 613, 626, 199 N.E.2d 538, 551 (1964). The opinion in *Wilcox v. Shell Eastern Petroleum Products, Inc.,* 283 Mass., 383, 186 N.E. 562 (1933) makes a similar statement regarding agreements to agree. It states:

> The fact that the parties agreed in the instrument that there should be a later formal contract, while not conclusive on the question whether they intended earlier to be bound or to what extent they intended to be so bound, *Donovan v. Freeman,* 263 Mass. 561 [161 N.E. 606], tends to indicate the intent that their final contract was to be the binding expression of all their completed negotiations.

*Wilcox v. Shell Eastern Petroleum Products, Inc.,* 283 Mass. 383, 387, 186 N.E. 562, 566.

■ The Probber/VOKO letter shows intention to execute a final written agreement in the future. The letter states, "... VOKO and Probber also agree to negotiate a more detailed contract at their earliest mutual convenience." (¶ 3) Initially, this letter indicates with the guidance of *Wilcox* and *Rosenfield* decisions, that VOKO and Probber did not intend to be bound until the "more detailed contract" was completed.

B. When essential terms of the agreement are not included in the writing, the writing does not constitute an enforceable contract.

■ The issue can also ·be phrased as whether the respective obligations of the parties are clear enough for the Court to enforce the agreement as a final expression of the parties' intentions, (assuming intention to be presently bound is shown). The court in *Wilcox* found:

> The relationship which the parties proposed to create necessarily included a considerable amount of details and, during its potentially long life, substantial sums of money. The reciprocal obligations of the parties in this relationship were such that ordinarily men entering into it would require a contract with full expression of their respective duties and liabilities.

*Wilcox v. Shell Eastern Petroleum Products, Inc.,* 283 Mass. at 387, 186 N.E. at 566. The court in *Wilcox* found that the essential terms required for a legally binding contract in this instance, such as price, quantity of purchases and payment terms, were not provided for in the preliminary agreement. The *Wilcox* court states the general rule:

> In order that the plaintiff may recover, the instrument relied on must be found to state the essential terms of a contract, by which the parties intended to be bound, with sufficient definiteness and clarity that a court, by interpretation with the aid of existing and contemplated circumstances, may enforce it.

*Wilcox v. Shell Eastern Petroleum Products, Inc.,* 283 Mass. at 388, 186 N.E. at 567. The VOKO/Probber letter may or may not show intention to be bound. Even if the Court could find intention to be bound at the time the letter was drafted, the Court would have difficulty determining the parties' respective obligations. Paragraph 2 refers to the parties' obligations. It states, "Probber will import products and components from VOKO and/or manufacture the VOKO system ... as will *be beneficial and agreeable to both*

*companies."* (Emphasis added). Even though the letter refers to the Partnership and License and Know-How Contract, the parties had yet to agree on what their terms and conditions would be. Even if this letter agreement did constitute a contract, it may be unenforceable due to uncertainty. Essential terms regarding basic prices of products, costs of delivery, installation handling, and which party would bear the burden of these costs were not included in this writing. The writing stipulated that the agreement became "... effective when signed ... and may first be terminated on 31st Dec. 1985 by serving notice of 1 year." In other words, the letter contemplated a relationship between the parties of perhaps three years and two months from the date of the letter with provision for three calendar year extension periods. The parties contemplated a distributorship and/or manufacturing agreement which would necessarily be a complicated venture.

Defendant's Exhibit No. 28 is a good example of the many essential terms that were not addressed in the October 31st letter. This exhibit is entitled, "License Agreement." It was a proposed contract drafted by Probber and never accepted by VOKO to further define the respective obligations of the parties. This agreement includes terms regarding authority to use VOKO trademark, maintenance of secrecy of VOKO technology, and patent rights for improved technology. Examples of essential terms included in this agreement is on page 3, numbered paragraph 5, entitled "Furnishing of Technical Aid and Know-How." It states:

5.1 VOKO shall deliver to the Partnership at the Partnership's principal offices such documentation and information in VOKO's possession with respect to the Products and the Propriety Technology as the Partnership shall request. If such documentation and information is not in English, VOKO shall provide the Partnership with *translations* thereof. VOKO shall supply all necessary *design documentation,* parts lists and work plans for the production and assembly of the Products. VOKO shall make available to the Partnership such technical personnel as may be necessary to fully acquaint the personnel of the Partnership with the Products and Proprietary Technology, and shall periodically update the Partnership with respect to the Proprietary Technology. VOKO shall *train employees of the Partnership and its agents and subcontractors* in methods of producing and distributing the Products. VOKO and the Partnership shall agree from time to time with regard to suitable numbers, technical aptitude and the length of the training period of personnel to be sent to Germany by the Partnership. Such persons shall remain employees of the Partnership or its agents or subcontractors during the training period. During the training period, the Partnership shall *bear traveling, accommodation and subsistence costs of,* and shall bear the responsibility for obtaining insurance coverage for, such personnel.

5.2 VOKO shall provide the Partnership with handbooks and complete *sample catalogues* and shall provide the necessary training of qualified staff of the Partnership for consulting and sales duties on the same basis described in Section 5.1.

5.3 Insofar as the Partnership wishes to purchase *sample furnishings, models, tools, devices, machines, components,* advertising material or similar material from VOKO, such materials shall be sold to the Partnership by VOKO at VOKO's *direct labor* and material costs, without mark-up, and otherwise subject to VOKO's Standard Conditions of Sale and Delivery. Assistance in factory planning or exhibition planning shall be provided on the same terms. (emphasis added)

These paragraphs define the respective obligations to provide sample catalogues, training for Probber sales representatives, traveling costs, translations among other terms. The parties do not have a completed contract unless some of these basic obligations are defined and agreed. Other im-

portant terms that were not included in the October 31st letter include shipping and installation costs, standards for quality of products, costs for storage in U.S.A., terms regarding display rooms and showrooms in the U.S.A., and compensation or commission rates for Probber sales people.

The parties did not have a completed contract with all essential terms and, thus, Probber had great difficulty receiving cooperation from VOKO in its marketing efforts. Probber could not obtain price lists to meet its customers' needs, and lost sales. Probber could not arrange for training for its sales representatives. Probber could not obtain accurate information regarding shipping and handling costs or receive up-to-date sales catalogues. All these problems would have been provided for in a complete contract.

The letter agreement of October 31st does not constitute an enforceable contract. The obligations of the parties had yet to be defined and the Court has no basis on which to enforce the agreement.

The determination that no legally binding contract was created by the October 31, 1982 agreement or by any of the subsequent activities of the parties does not end the Court's determination of this matter. The Court considers the cases cited by Probber and discovered by the Court's own research readily distinguishable. *Chedd-Angier Production Co. v. Omni Publications International, Ltd.*, 756 F.2d 930 (1st Cir.1985);[4] *Coan v. Holbrook*, 327 Mass. 221, 97 N.E.2d 649 (1951); *John T. Burns & Sons, Inc. v. Brasco*, 327 Mass. 287, 98 N.E.2d 262 (1951); *Bartlett v. Keith*, 325 Mass. 265, 90 N.E.2d 308 (1950). Nevertheless, in the interests of judicial economy and because the parties have briefed and presented their case as if there was a legally binding agreement of some sort, the Court will also deal with the question of whether such exclusivity was an element, presuming a contract of some sort did exist.

We can struggle over the details, some more important than others, such as the meaning of the elimination of the words "sole" or "exclusive" from the Probber draft to the final document signed by the parties on October 31, 1982 or the conflict between the two types of agreements referred in that preliminary agreement, but at least two aspects of that document are clear. First, VOKO was willing to have Probber try to sell its products and, a second, that the details were to be worked out. The correspondence and actions of the parties take conflicting tacks and even occasional jibes away from their intended course but certain marks of the course stand out.

■ VOKO already had distributors throughout most of Europe and the Near East but, thanks to VOKO's devious and conflicting responses to discovery, it was not clear exactly under what arrangements these distributors operated. However, the undisputed fact remains, that with the ex-

---

**4.** The *Omni* Court was "convinced that this was a close case," 756 F.2d at 935, and turned not on the original conditional writing but on subsequent oral conversations that, if believed, explicitly confirmed the arrangement:

> Appellate review of a jury verdict is extremely restricted and should be granted cautiously and sparingly. To do otherwise deprives the party of a decision by jury. We are compelled, therefore, even in a close case, to uphold the verdict unless the facts and inferences, when viewed in the light most favorable to the party for whom the jury held, point so strongly and overwhelmingly in favor of the movant that a reasonable jury could not have arrived at this conclusion. *Rios v. Empresas Lineas Maritimas Argentinas*, 575 F.2d 986, 989–90 (1st Cir.1978). Sim-

ply Put, where it is possible to disagree about the outcome, the matter must go to the jury. *Dumas v. MacLean*, 404 F.2d 1062, 1064 (1st Cir.1968).

> *Omni* has failed to persuade us that the facts of this case so conclusively point to a verdict in its favor that fair-minded people could not disagree about the outcome. The evidence was as conflicting as it was voluminous and as such this case is not one, as the district court noted, "where there is but one reasonable conclusion as to the proper judgment denying *Omni's* motion for judgment notwithstanding the verdict.

756 F.2d at 934. The Mass. cases deal with exclusive brokerage agreements that, like the *Omni* case, rest on their particular facts.

ceptions of perhaps two small near eastern countries and perhaps two countries with wholly owned VOKO distributors, there was no country with a single/exclusive distributor. It really strains credibility as well as reasonable business judgment to expect that VOKO would change its well established policy of dividing even the smaller European country and give exclusive distributorship to potentially its richest market, the United States, Canada, and all of the Caribbean, to a relatively small unknown without obtaining extensive financial data and opportunity to test performance.

In fact, VOKO's performance is most consistent with this interpretation of an agreement to test the waters as a preliminary to a determination of the type of business arrangement that was best suited to a development of this new market.

While Probber is pushing ahead to show how well it can perform, VOKO is seeking the information one would expect as preliminarily necessary to setting a course. In its letters, VOKO wants all kinds of financial and background information—it wants deposits for material to be shipped, it wants projections of development costs, and it is keeping its options open by exploring other distributor possibilities—and doing it all so openly as to even asking Probber's opinions of other possible distributors while encouraging Probber to produce some actual sales. VOKO would like to make a solid arrangement with Probber, despite its lack of performance, and joins with it at trade shows and even runs a training course for its staff. When after two years there are still no substantial sales, just promises, it is even willing to consider a more formal joint venture under a general manager hired for just this purpose, but none of this comes to fruition when, on top of Probber's disappointing bottom line results, it learns that Probber's financial situation has forced it to sail below its anticipated course into that area shown on the charts as dangerous because of rocks, called Chapter 11. Even then, it turns down other possible distribution plans and enters a conditional agreement to give Probber one last chance to perform, and that arrangement collapses.

I find and rule that Probber and VOKO agreed to authorize Probber to represent it as a preliminary to formalizing a long-term distributorship on a basis to be further negotiated and further negotiations did, in fact, take place and an agreement was even signed calling for a further trial run. But the ultimate agreement for a long-term distributorship never materialized because of Probber's failure to successfully market VOKO's products and its financial difficulties. No commitment to an exclusive distributorship was intended by VOKO at this preliminary stage. None was created by the agreement of October 31, 1982 nor by any of the parties' actions thereafter. Neither Probber nor VOKO acted in bad faith—they just never met each other's expectations and, therefore, were unable to get beyond their preliminary agreement to attempt to agree on anything more than that Probber could try to sell VOKO products. We need not consider what Probber would have been paid for any sales it made since, admittedly, no sales were consummated. The best that Probber could have, if one were to assume some validity to the October 31, 1982 agreement was an agreement to try to agree, which does not expire until December, 1985, provided appropriate notice of termination was given, giving Probber a non-exclusive right until then to try to sell any of VOKO's products, and VOKO would have an obligation to honor any such sales under its usual terms.